29 A.3d 584

**PATUXENT RIVERKEEPER**

v.

**MARYLAND DEPARTMENT OF the ENVIRONMENT, et al.**

**No. 139, Sept. Term, 2010.**

Court of Appeals of Maryland.

Sept. 30, 2011.

Reconsideration Denied Oct. 24, 2011.

G. Macy Nelson (David S. Lynch of Law Office of G. Macy Nelson, LLC, Towson, MD), on brief, for appellant.

Edward C. Gibbs, Jr. (Thomas H. Haller and Richard H. Sothoron, Jr. of Gibbs and Haller, Largo, MD), on brief, for appellees.

Adam D. Snyder, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Emily A. Vainieri, Asst. Atty. Gen., Baltimore, MD), for appellees.

Jon A. Mueller, Esq., Amy E. McDonnell, Esq., Chesapeake Bay Foundation, Annapolis, MD, Jane F. Barrett, Esq., University of Maryland School of Law, Environmental Law Clinic, Baltimore, MD, for Amicus Curiae joint brief of the Chesapeake Bay Foundation, Inc., and Waterkeeper Alliance. Inc.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

In this case, we are asked to determine whether a nonprofit environmental group, Patuxent Riverkeeper,[1] Petitioner, ("Riverkeeper"), has standing[2] to initiate a judicial review action of a decision of the Respondent, the Maryland Department of the Environment, ("MDE"), to issue a "non-tidal

---

**1.** According to the affidavit of the Chief Executive Officer of the Patuxent Riverkeeper, Frederick Tutman, "[t]he Patuxent Riverkeeper is a nonprofit watershed advocacy organization affiliated with the Waterkeeper Alliance in New York, an umbrella group that licenses and links Waterkeepers internationally. . . . The sole purpose of the Patuxent Riverkeeper is to protect, restore, and advocate for clean water in the Patuxent River and its connected ecosystem."

**2.** The doctrine of "standing" refers to the ability "to invoke the judicial process in a particular instance." *120 West Fayette Street, LLLP v. Mayor of Baltimore*, 407 Md. 253, 270, 964 A.2d 662, 672 (2009), quoting *Adams v. Manown*, 328 Md. 463, 480, 615 A.2d 611, 619 (1992).

wetlands permit"[3] to Petrie/ELG Inglewood, LLC, now known as Woodmore Towne Centre, LLC, Respondent ("Woodmore Towne Centre"),[4] in connection with the development of the Woodmore Towne Centre at Glenarden in Prince George's County. Specifically, Woodmore Towne Centre had applied for the permit to construct a road extension and stream crossing at Ruby Lockhart Boulevard in order to provide primary access into the development. During the administrative proceeding before MDE, Riverkeeper had submitted written comments against the permit, asserting that Woodmore Towne Centre had not demonstrated that the proposed road extension and stream crossing had "no practicable alternative" that would "avoid or result in less adverse impact on nontidal wetlands."

---

3. Nontidal wetlands, commonly referred to as "marshes, swamps, bogs, wet meadows, and bottomland forests," are protected by a permitting process administered by the Maryland Department of the Environment from unnecessary and avoidable impact for the following reasons:

   Nontidal wetlands help protect the Chesapeake and Coastal Bays and streams by filtering phosphorus, nitrogen, and other pollutants from upland runoff. They form natural flood retention areas able to store floodwater and slowly release them downstream, reducing flood damage. Nontidal wetlands vegetation helps stabilize streambanks and reduce streambank erosion. They also provide habitat for fish and wildlife, including many rare, threatened and endangered species, and organic material for the food chain. Nontidal wetlands are also areas of scenic beauty and provide recreational opportunities. The goal of the nontidal wetlands and waterways program is to manage nontidal wetlands and to provide essential resource protection by authorizing only necessary and unavoidable impacts. To accomplish this goal, the following activities are regulated by the Department:
   - Grading or filling
   - Excavating or dredging
   - Changing existing drainage patterns
   - Disturbing the water level or water table
   - Destroying or removing vegetation

   *3.19 Nontidal Wetlands (Nontidal Wetlands and Waterways Permits),* http://www.mde.state.md.us/programs/Permits/Documents/2008permit guide/WMA/3.19.pdf (last visited Sept. 25, 2011).

4. Based upon the record, "Woodmore Towne Centre" appears to be the correct title. In various pleadings and court documents, however, the development is referred to as "Woodmore Towne Center."

After MDE approved the permit, Riverkeeper initiated a judicial review action in the Circuit Court, after which both MDE and Woodmore Towne Centre filed motions to dismiss for lack of standing.[5] The Circuit Court dismissed the judicial review action, and Riverkeeper petitioned this Court for a writ of certiorari, which, prior to any proceedings in the intermediate appellate court, we granted, *Patuxent Riverkeeper v. Department of the Environment*, 418 Md. 190, 13 A.3d 798 (2011), to address the following question:

> Did the circuit court err when it interpreted the federal test for standing and held that the Riverkeeper lacked standing to challenge the issuance of a Maryland nontidal wetlands and waterways permit authorizing permanent and temporary impacts to nontidal wetlands and streams where one of Riverkeeper's members alleged that the permit would result in future and threatened harm to his recreational, aesthetic, and economic interests in the Western Branch watershed and tributary?

We shall hold that Riverkeeper has standing to initiate a judicial review action, because its member, David Linthicum, had alleged sufficient harm to his aesthetic, recreational, and economic interests in connection with the issuance of the nontidal wetlands permit in issue.

Section 5–204(f) of the Environment Article, enacted by Chapters 650 and 651 of the Maryland Laws of 2009 and effective January 1, 2010, enables a person to seek judicial review of an administrative determination by the Maryland Department of the Environment regarding certain environmental permits, including those affecting non-tidal wetlands, if the person satisfies the federal rubric for standing:

> (f) *Judicial review of final determination by Department.*—A final determination by the Department on the issuance, denial, renewal, or revision of any permit issued under Title 5, Subtitle 5 or Subtitle 9, § 14–105, § 14–508,

---

5.  Riverkeeper also filed a motion to stay the decision by MDE to issue the non-tidal wetlands permit to Woodmore Towne Centre pursuant to Rule 7–205. Although MDE has indicated that the motion was denied, there is no notation in the record as to its disposition.

§ 15–808, or § 16–307 of this article is subject to judicial review at the request of any person that:

(i) Meets the threshold standing requirements under federal law; and

(ii) 1. Is the applicant; or

2. Participated in a public participation process through the submission of written or oral comments, unless an opportunity for public participation was not provided.

Maryland Code (1982, 2007 Repl.Vol., 2010 Supp.), Section 5–204(f) of the Environment Article.

Prior to this enactment, standing to challenge permitting decisions by MDE was limited to a person who was "aggrieved" by the agency's action, namely "one whose personal or property rights [were] adversely affected by the decision." *See Bryniarski v. Montgomery County Board of Appeals*, 247 Md. 137, 144, 230 A.2d 289, 294 (1967); *Sugarloaf Citizens' Ass'n v. Department of Environment*, 344 Md. 271, 288, 686 A.2d 605, 614 (1996) ("[I]n order to be 'aggrieved' for purposes of judicial review, a person ordinarily must have an interest 'such that he is personally and specifically affected in a way different from . . . the public generally.'") (citations omitted); *120 West Fayette Street, LLLP v. Mayor and City Council of Baltimore*, 407 Md. 253, 270–71, 964 A.2d 662, 671–72 (2009). Moreover, a group could not establish standing to initiate judicial review of a permitting decision by an administrative agency, unless the organization had a "property interest of its own—separate and distinct from that of its individual members." *Medical Waste Associates, Inc. v. Maryland Waste Coalition, Inc.*, 327 Md. 596, 612, 612 A.2d 241, 249 (1992), quoting *Citizens Planning & Housing Ass'n v. County Executive of Baltimore County*, 273 Md. 333, 345, 329 A.2d 681, 687 (1974).

In enacting Chapters 650 and 651 of the Maryland Laws of 2009, which originated as Senate Bill 1065 and House Bill 1569, the General Assembly embraced the "broader" notion of standing applied in federal courts, to enable both individuals and organizations to challenge environmental permits in judicial review actions, were certain conditions to exist:

With respect to cases involving challenges to specific types of permits, *Maryland courts have defined "aggrievement" to mean the ownership of property either adjacent to, or within " 'sight or sound' range of the property that is the subject of [the plaintiff's] complaint."*

**The Court of Appeals has held that an association lacks standing to sue where it has no property interest of its own, distinct from that of its individual members.** *Citizens Planning & Housing Ass'n v. County Executive,* 273 Md. 333, 329 A.2d 681 (1974). In *Medical Waste Ass'n [Associates ] v. Maryland Waste Coalition,* 327 Md. 596, 612 A.2d 241 (1992), the Court of Appeals stated that if an individual or organization is seeking to redress a public wrong, the individual or organization has no standing unless the wrong suffered is different in character and kind from that suffered by the general public.

Federal law is broader than State law in its determination of standing. Under federal law, a party has standing if its use and enjoyment of the area is affected by the challenged action/decision or if the party has a particular interest in the property affected. **Federal law also makes little distinction between individual and group standing.**

Environmental Matters Committee Floor Report on House Bill 1569, at 4 (2009).[6]

The touchstone Supreme Court case involving environmental standing, *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), drew the federal landscape in environmental actions. In that case, a judicial review action to enforce a

---

**6.** Woodmore Towne Centre asks us to consider that during the 2009 legislative session, the General Assembly also considered and did not embrace Senate Bill 824, which would have permitted "citizen lawsuits without a showing of special harm," reflecting a legislative intent, in the passage of House Bill 1569 and Senate Bill 1065, instead, to restrict standing. We have consistently opined, however, that the failure of passage of a bill in the General Assembly "is a rather weak reed upon which to lean in ascertaining legislative intent." *T.H.E. Insurance Co. v. P.T.P., Inc.,* 331 Md. 406, 422, 628 A.2d 223, 231 (1993) (citations omitted).

permit authorizing the limited discharge of pollutants, pursuant to the Clean Water Act, 33 U.S.C. § 1342, the Court determined that to satisfy standing in an environmental action, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 180–81, 120 S.Ct. at 704, 145 L.Ed.2d at 627, quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992). An environmental group can satisfy standing federally if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. at 704, 145 L.Ed.2d at 627.

In *Friends of the Earth,* the Court emphasized that injury in fact has included a negative impact on the organizational representatives' recreational or aesthetic appreciation of the affected area, in that case the demonstrably diminished ability or desire to hike, camp, picnic, swim, canoe, boat or fish in a river contaminated by pollutants. 528 U.S. at 181–82, 120 S.Ct. at 704–705, 145 L.Ed.2d at 627–28. In addition, the Supreme Court determined that a person may suffer an injury in fact when his economic interests are negatively impacted, for instance, lower home prices due to proximity to a hazardous waste incinerator. *Id.* at 182–83, 120 S.Ct. at 705, 145 L.Ed.2d at 628. The Court noted that an injury to aesthetic, recreational, or economic interests need not be consummated, so long as an individual can demonstrate reasonable concerns about the effects of the challenged activity. *Id.* at 183–84, 120 S.Ct. at 705–706, 145 L.Ed.2d at 628–29.

Such aesthetic, recreational, or economic interests or values, however, must be based upon a demonstrable record of regularly utilizing the affected area, as well as a desire to do so in the future. In *Summers v. Earth Island Institute,* 555 U.S.

488, 494–96, 129 S.Ct. 1142, 1150, 173 L.Ed.2d 1, 10 (2009), the Supreme Court reasoned that an organizational representative's affidavit indicating a desire to "visit several unnamed National Forests in the future" was not sufficiently particularized to establish a cognizable aesthetic or recreational interest. Moreover, asserting a past injury to aesthetic or recreational interests, arising for example, from "past ... development on Forest Service land," without demonstrating a continuing or future harm, further does not suffice. *Id.* at 495, 129 S.Ct. at 1150, 173 L.Ed.2d at 9–10. The Court also has opined that a genuine nexus must exist between the alleged injury and the challenged conduct, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992), and that the remedy requested must "effectively abate[ ] [illegal] conduct and prevent[ ] its recurrence." *Friends of the Earth,* 528 U.S. at 185–86, 120 S.Ct. at 706, 145 L.Ed.2d at 630.[7]

At the time the new standing test was embraced by the Maryland Legislature, not only had the Supreme Court spoken, but other federal appellate courts already had an opportunity to interpret the tenets of the Supreme Court cases. The application of these precepts prior to the enactment of Section 5–204(f) of the Environment Article in 2009 illustrates the boundaries of standing in environmental cases to which the General Assembly had referred when it enacted the statute.[8] In *Sierra Club v. Franklin County Power of Illi-*

---

**7.** The General Assembly embraced these federal standing tenets in enacting House Bill 1569 and Senate Bill 1065, as evidenced by the Environmental Matters Committee Floor Report to House Bill 1569, which states:

> Under **federal case law,** in order to have standing, "a plaintiff must show **(1)** it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; **(2)** the injury is fairly traceable to the challenged action of the defendant; and **(3)** it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

Environmental Matters Committee Floor Report on House Bill 1569, at 4.

**8.** The General Assembly referred to limitations on standing in environmental cases in the Environmental Matters Committee Floor Report to House Bill 1569, as follows:

*nois, LLC,* 546 F.3d 918, 925 (7th Cir.2008), the Court of Appeals for the Seventh Circuit determined that a Sierra Club member adequately alleged an injury by asserting that she

However, **federal cases have at times limited the application of these broad standing requirements.** U.S. Supreme Court decisions during the 1990s required plaintiffs alleging environmental injury in federal courts to meet stringent standing requirements. In a series of decisions, the court held that **(1)** averments by plaintiffs that a federal agency action affecting specified tracts of land adversely affected their recreation on unspecified portions of public land *lacked geographic specificity for standing;* **(2)** an environmental group's allegations that, as a result of a federal action, the group's members would not be able to observe endangered species at a location the members intended to visit at an unspecified time in the future *lacked temporal specificity for standing;* and **(3)** a plaintiff *failed to meet the redressability component* of federal standing when a defendant came into compliance during the 60–day notice period prior to a citizen action suit being filed, since the civil penalties requested by the plaintiff were payable to the federal government, not the plaintiff, and thus could not redress any injury plaintiffs continued to suffer as a result of the former violation.

However, in a 2000 decision, the court held that *sworn statements by plaintiffs that waste discharged from a corporate hazardous waste incinerator into a local river interfered with their recreational use of the river downstream met the "injury in fact" component* of federal standing since "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."

**On March 3, 2009,** *the U.S. Supreme Court held that an association lacked standing* to challenge regulations of the U.S. Forest Service exempting small fire-rehabilitation and timber-salvage projects from specified notice, comment, and appeals processes applicable to more significant land management decisions. The court determined that the group had standing with respect to the imminent and concrete harm threatened to its members by a specific project; however, since the group had voluntarily settled that portion of the dispute, it could no longer use the threat imposed by that project on its members to meet the standing requirements of Article III of the federal constitution. Furthermore, the *court determined that the remaining affidavit submitted in support of the group's standing stating that one of its members: (1) had suffered past injury from development on Forest Service land; and (2) wants to visit the National Forests in the future was insufficient to prove that the application of the regulations posed an actual or imminent injury to any of the association's members.* See *Summers et al. v. Earth Island Institute et al.,* 555 U.S. 488, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009).

Environmental Matters Committee Floor Report on House Bill 1569, at 5–6.

and her family had taken trips to "fish, kayak, camp, and enjoy the natural beauty and clean environment" of a lake, located three miles from the site of a proposed power plant, and that if the plant were built, she would cease her recreational trips. Similarly, in *American Canoe Ass'n, v. City of Louisa Water & Sewer Comm'n,* 389 F.3d 536, 542 (6th Cir.2004), the Court of Appeals for the Sixth Circuit reasoned that an environmental group representative had demonstrated a sufficient injury when he alleged that he previously recreated in a river near a water treatment plant, but that he presently refused to do so, because of pollution caused by discharges from the plant. In so doing, federal appellate courts have noted that a plaintiff may express reasonable concerns about the future impacts of the challenged activity. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 160 (4th Cir.2000) (reasoning an environmental group member "need not wait until his lake becomes barren and sterile or assumes an unpleasant color and smell before he can invoke the protections of the Clean Water Act").

The injury alleged must share a specific nexus with the harm asserted. In *Natural Resources Defense Council v. Southwest Marine, Inc.,* 236 F.3d 985, 995 (9th Cir.2000), the Court of Appeals for the Ninth Circuit determined that the plaintiff had adequately demonstrated such a nexus by indicating that sediments in defendant's marine leasehold contained elevated concentrations of pollutants, that defendant had discharged such pollutants, and that defendant's marine leasehold was "devoid of life." In contrast, in *Center for Biological Diversity v. Lueckel,* 417 F.3d 532, 540 (6th Cir.2005), the Sixth Circuit reasoned that although the environmental group representatives had shown that they had suffered concrete injuries to their aesthetic, recreational, and scientific interests in the scenic rivers in question due to commercial logging, the plaintiffs had failed to demonstrate the requisite connection because they had not referred to specific evidence that the United States Forest Service's failure to enact a "comprehensive resource management plan" had caused the approval of the environmentally harmful projects.

According to the federal appellate court, an aggrieved party also must show that a favorable decision will likely, not merely speculatively, relieve the injury alleged. Alleging a previous injury, for instance, without referencing a continuing or future harm, will not suffice. *Lueckel,* 417 F.3d at 537 (reasoning that "plaintiffs . . . must show that actual, site-specific activities are diminishing or threaten to diminish their members' enjoyment of the designated river segments").[9]

The parties in the present case differ, though, not regarding the test for standing, but in its application to the factual circumstances presented. Riverkeeper asserts that its member, Mr. Linthicum, suffered an injury in fact, because his aesthetic, recreational, and economic interests in the Patuxent River, particularly the Western Branch watershed,[10] have

---

**9.** In decisions issued after May 19, 2009, when Section 5–204(f) was enacted, the same precepts continue to be emphasized by the various federal appellate courts. *See American Bottom Conservancy v. U.S. Army Corps of Engineers,* 650 F.3d 652, 656–57 (7th Cir.2011) (reasoning that bird and butterfly watchers had shown an aesthetic or recreational interest); *Animal Welfare Institute v. Martin,* 623 F.3d 19, 25 (1st Cir.2010) (reasoning that observers of rare species, such as the Canada lynx, had demonstrated an aesthetic or recreational interest); *Wilderness Society, Inc. v. Rey,* 622 F.3d 1251, 1257 (9th Cir.2010) (reasoning that environmental group member's "some day" general intention to return to the national forests of two different states was too vague to satisfy the injury in fact requirement); *Friends of Tims Ford v. Tennessee Valley Authority,* 585 F.3d 955, 970 (6th Cir.2009) (reasoning that alleging a previous injury without referencing a continuing or future harm, for instance, asserting an injury from already-constructed community boat docks, will not suffice); *Pollack v. U.S. Department of Justice,* 577 F.3d 736, 742–743 (7th Cir.2009) (reasoning that the plaintiff had not suffered an injury in fact, because he indicated only a general desire to visit parks and watch birds along an unspecified portion of Lake Michigan bordering on Illinois, an area stretching for approximately 70 miles, and failed to identify how his interest in bird-watching in the area would be negatively impacted by the gun range activities he challenged).

**10.** The Western Branch is a tributary of the Patuxent River located in Prince George's County, Maryland, and the mainstem of the tributary is approximately 20 miles long. *Western Branch Patuxent River TMDL,* http://www.mde.state.md.us/programs/Water/TMDL/ApprovedFinal TMDLs/Pages/Programs/WaterPrograms/TMDL/approvedfinaltmdl/ tmdl_westernbranch.aspx (last visited Sep. 26, 2011).

been jeopardized by the road extension and stream crossing allowed by the permit. In particular, Mr. Linthicum asserts that the upstream impacts caused by the crossing will cause "nitrogen and other pollutants" to leach into waters downstream. Woodmore Towne Centre counters that Mr. Linthicum failed to satisfy the standing inquiry, because he failed to demonstrate that the issuance of the permit has negatively impacted his paddling and cartography activities on the Western Branch watershed.[11]

In his affidavit, Mr. Linthicum described the aesthetic and recreational interests he has in paddling, wading, and clearing branches in the Western Branch of the Patuxent River:

5. I visit the Patuxent River almost every other day. I have visited and will continue to visit the Western Branch every few months. When visiting the Western Branch, I paddle along the tributary, and also wade in the water to clear out branches for the purpose of waterway maintenance and navigation. I have been paddling, wading, and clearing branches and other blockages in the Western Branch for nearly ten years. Beyond my recreational interests in the Western Branch tributary and watershed, I also have aesthetic and environmental interests in the Western Branch, as the river and watershed is much healthier and cleaner than surrounding watersheds such as the Anacostia watershed.

6. The area of the Western Branch tributary and watershed that I most often visit is downstream from the location of the Woodmore Towne Center Project. I sometimes paddle in the Western Branch as far north as Upper Marlboro, which is approximately 8.5 miles downstream from the areas of wetlands and streams that are impacted by the Woodmore Towne Center.

He further described the negative impact of the issuance of the MDE permit on the wetlands and streams in the Western Branch, where he most often paddles and clears blockages in

---

11. MDE does not take a position regarding whether Riverkeeper, under the factual circumstances presented, has met the requirements for standing under federal law.

the waterway, jeopardizing his aesthetic and recreational interests:

7. The wetlands permit pertaining to the Woodmore Towne Center will cause impacts to wetlands and streams in the Western Branch watershed. These impacts will ultimately have a direct effect on the watershed and the river downstream, where I most often paddle and clear blockages in the waterway. Specifically, the stream impacted by the Ruby Lockhart Boulevard extension on the Subject Property is the north fork of the Southwest Branch of the Patuxent River (this stream is marked "S" on a map that I prepared for the Subject Property, attached as Exhibit C). This stream runs southward from the Subject Property through developed and undeveloped land before ultimately joining the Western Branch tributary approximately five miles downstream. Smaller drainages on the north end of the Subject Property (marked as "W" on Exhibit C) also connect directly with the Western Branch and the Patuxent River itself. These smaller drainages flow into Bald Hill Branch approximately 3/4 mile from the Subject Property. Bald Hill Branch then joins the Western Branch just over a mile further downstream.

8. The health of the Western Branch, including the area where I most often paddle, wade, and clear trees and other blockages, will suffer as a direct result of the impacts to the connected streams and tributaries just a few miles upstream at the Woodmore Towne Center site.

9. Diverting and/or compromising the streams on the Subject Property can affect the flow rate and the ecology of the tributaries of the Patuxent River. Moreover, drainage of stormwater from the impervious surfaces of the Woodmore development into the surrounding streams and watershed will further degrade the water quality of the Western Branch. Western Branch is a system already in decline due to the vast amount of paving, construction, channelization and other human intervention in its natural functions. Like many tributaries, streams, and creeks elsewhere in Prince George's County, Western Branch fails to meet Federal

water quality standards, and appears to be approaching the tipping point of no return.

10. The impacts to wetlands on the Subject Property will also have a negative effect on my activities downstream in the Western Branch. Wetlands provide recharge and storage of surplus water during storm events, which can lessen the impacts of flooding and property damage to downstream neighbors. Wetlands serve as natural "sponges" to absorb manmade toxins and poisons that leach from surrounding contaminated runoff caused by paved surfaces, trash, and chemicals applied to urbanized lands. The loss of the natural wetlands in a river system eventually leads to the death and desertification of a river's tributaries and takes an equivalent toll on the waters of the main channel.

11. I have reviewed recent scientific and academic literature that has discussed the connection, both in Maryland and in general, between urbanization, impacts to streams and headwaters, and the deleterious effects on watersheds and rivers downstream. One of these articles discussing this connection states: "Headwater systems are important sources of sediments, water, nutrients, and organic matter for downstream reaches. Despite the significant roles of headwater systems within the channel network, the ecological values of headwater systems are underestimated, and their processes have been extensively modified by land use." *See* Takashi Gomi, Roy C. Sidle & John S. Richardson, *Understanding Processes and Downstream Linkages of Headwater Systems,* BioScience, Vol. 52, No. 10, Oct. 2002, at 914. I have also read that "[the] natural dendritic properties of stream networks play an intrinsic role in the delivery of nitrogen and other pollutants to downstream receiving waters from headwater locations throughout watersheds." *See* Richard B. Alexander, Elizabeth W. Boyer, Richard A. Smith, Gregory E. Schwarz & Richard B. Moore, *The Role of Headwater Streams in Downstream Water Quality,* Journal of the American Water Resources Association, Vol. 43, No. 1, Feb. 2007, at 57. In the context of streams and wetlands, the term "dendritic" refers to the

branch-like characteristics of upstream headwaters, which then funnel into a single stream or river downstream, as is the case with the Western Branch watershed and tributary. (internal footnote omitted).

On the basis of Mr. Linthicum's affidavit, as well as the testimony he presented at a hearing on the motions to dismiss,[12] the Circuit Court found that Mr. Linthicum is "a frequent recreational paddler" on the Western Branch of the Patuxent River and also has an "aesthetic interest in the beauty of the river and the cleanliness of its water." The court further found that Mr. Linthicum has "an economic interest in navigating the river, [because] he charts its tributaries to produce maps and guides that he sells to the Riverkeeper and others."

Despite these findings, the judge dismissed the judicial review action for lack of standing, determining that the injury Mr. Linthicum alleged on behalf of Riverkeeper was merely "conjectural or hypothetical":

> On the other hand, Mr. Linthicum has never visited the actual site of the permit at issue and has never paddled on the tributary that has been altered by development of the Towne Center, nor has he testified to an intention or desire to do so. He has not seen any effects, other than seasonal ones, on the parts of the river he does travel since the completion of the work at the Towne Center. Indeed, he did not even realize there had been work impacting a wetland until a few weeks before offering his testimony to the Court, long after that work had been completed.[13]

---

**12.** The Circuit Court relied upon affidavits as well as testimony presented at a hearing on the standing issue, thereby converting the motions to dismiss into motions for summary judgment. *Tomran, Inc. v. Passano,* 391 Md. 1, 10 n. 8, 891 A.2d 336, 342 n. 8 (2006). None of the Circuit Court's findings, however, are in dispute, but only its application of the law of standing.

**13.** In a related vein, Woodmore Towne Centre asserts that Riverkeeper was required to establish standing "as of the date" of filing of the judicial review action in the Circuit Court, referring us to *Nova Health Systems v. Gandy,* 416 F.3d 1149 (10th Cir.2005), and further asserts

In other words, completion of the work authorized by the wetlands permit issued by MDE has not affected Mr. Linthicum's day to day life on the river in any manner whatever. Instead, Mr. Linthicum claims that the Towne Center development will "ultimately" impact the watershed downriver where he carries on his business. Affidavit of David Linthicum ¶ 7. This is precisely the conjectural or hypothetical injury forbidden by *Summers, supra.* Mr. Linthicum has a good-faith belief that continued urbanization of Prince George's County will one day result in the erosion of the wetlands and waterways that he loves. As he testified, he fears the "death by a thousand cuts." This is not a sufficient injury in fact to establish standing under federal law and Md.Code, Enviro. § 5–204(f).

We disagree with the Circuit Court's legal assessment.[14] Mr. Linthicum alleged, and the Circuit Court found, that he had adequately asserted demonstrable aesthetic, recreational, and economic interests in the Western Branch as an avid paddler and mapmaker. The Circuit Court determined that the harm alleged, however, was not sufficiently concrete nor imminent, because Mr. Linthicum claimed that the permit allowing the road expansion and stream crossing would "ultimately" impact the Western Branch watershed downriver "where he carries on his business." In so doing, the judge failed to credit the reasonable concern that Mr. Linthicum

that he could not have satisfied standing, because he was not aware of the judicial review action until *after* Respondents filed the motions to dismiss for lack of standing. *Nova Health Systems* is not informative, however, because the court in that case was not applying the federal environmental standing precepts. Moreover, the Circuit Court reached the merits of the standing issue from which the writ of certiorari in this case emanates.

14. The dissent characterizes the Riverkeeper's claim as a gripe against "urbanization" rather than an injury in fact and asserts that dismissing Riverkeeper's suit on standing grounds is the only way to prevent "any appellant/petitioner or organization who uses or appreciates environmental or natural resources to say that environmental degradation is *per se* harm to them." This parade of horribles appears to be emanating from "collywobbles" at the thought of environmental organizations actually exercising standing to sue in their own right.

manifested about the future harm to the ecology of the Western Branch that would result from "diverting and/or compromising" upriver streams.

The injury suffered by Mr. Linthicum, moreover, shares a sufficient nexus to the issuance of the non-tidal wetlands permit, because Mr. Linthicum alleged, referring to scientific articles as well as his own experiences, that stream crossings at headwaters and wetlands, such as that constructed at Ruby Lockhart Boulevard, can cause negative affects downstream on the Western Branch watershed. Finally, at a hearing before the Circuit Court regarding the motions to dismiss, Frederick Tutman, Chief Executive Officer of Riverkeeper, described methods to abate the harm caused by the issuance of the permit, including rescission of the permit, as well as more intensive mitigation efforts:

> I would say in addition to the rescission of the permit, I think look at broader or more specific mitigation in line with the scope of the impacts[,] [b]ut, also, I think something of great value is being taken away from citizens adjacent to this site and the county and I don't think it's being put back. I think the quality of the mitigation that's been approved by the State[,] I don't think begins to really get to the heart of what's being taken away.

As a result, the motions to dismiss for lack of standing on the part of Riverkeeper should not have been granted, and the judicial review action should be permitted to proceed.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY RESPONDENT, PETRIE/ELG INGLEWOOD, LLC, ALSO KNOWN AS WOODMORE TOWNE CENTRE, LLC.**

HARRELL and MURPHY, JJ., Dissent.

HARRELL, J., dissenting, in which MURPHY, J., joins.

The Majority opinion correctly characterizes the broader nature of federal standing, as compared to Maryland's tradi-

tional "aggrievement" standard; however, by reversing the judgment of the Circuit Court in this case, it dilutes unfortunately the threshold requirements of injury in fact and traceability in the "new" standard. This unacceptable precedent instructs organizational plaintiffs challenging State environmental permits that they need only have a member who has aesthetic, recreational, or economic interests in the environment generally, rather than requiring a showing that these interests have a genuine nexus to, and will be harmed by, the permitted activity.[1] The Majority opinion waters down actually important federal standing requirements. Accordingly, I dissent and offer a more appropriate analysis of federal standing requirements as they apply to the facts in this case.

## I.

This case is a judicial review action of a nontidal wetlands and waterways permit issued by Respondent, the Maryland Department of Environment ("MDE"), to Respondent, Petrie/ELG Inglewood LLC, the developer of Woodmore Towne Center in Prince George's County, Maryland. The permit, issued on 19 March 2010, authorized filling of less than one acre of nontidal wetlands and allowed the developer to place several streams in a culvert to accommodate an access road for the development. At the time of permit issuance, over 550,000 square feet of commercial retail floor space in the development was under active construction in upland areas, outside of the MDE's jurisdiction under the Nontidal Wetlands Act.[2] *See* Maryland Code (1982, 2007 Repl.Vol.) Environ-

---

1. As the question presented in this matters is a legitimate case of first impression for this Court, and concerns frequently issued wetland and waterway permits, there is an especially high premium on providing accurate instruction to our Bench, the Bar, the affected government agency, and the public on the application of federal standing requirements in Maryland courts.

2. Petitioner could have addressed the potential for environmental degradation due to the construction activities, conducted wholly in uplands

ment Article § 5–901(j) (defining regulated activities) and § 5–903(b)(4) (requiring the MDE to evaluate proposed activities on nontidal wetlands). Construction activities, including wetland filling and placement of culverts, authorized under the MDE permit, were completed several weeks after issuance.

In the Circuit Court for Prince George's County, Petitioner, Patuxent Riverkeeper ("Riverkeeper"), an environmental advocacy group dedicated to preserving the health and water quality of the Patuxent River, challenged issuance of the permit. Riverkeeper sought judicial review under Maryland's new standing laws for certain environmental permits, which adopted the federal standing requirements, including the provisions for organizational standing. In the Circuit Court, Riverkeeper attempted to demonstrate organizational standing based on an affidavit and testimony of one of its members, David Linthicum. Respondents filed a motion to dismiss the action for lack of standing, which was granted by the Circuit Court. That is the posture in which this case reaches us.

### A. Maryland's New Standing Requirements

In 2009, the Legislature adopted amendments to the Maryland Code that changed the standing requirements for challenging certain environmental permits. Maryland Code (1982, 2007 Repl.Vol., 2010 Supp.), Environment Article § 5–204(f). Under prior Maryland standing principles, a challenger had to be "aggrieved" by an agency or board action in order to bring and maintain a judicial review challenge. Maryland Code (1982, 2007 Repl.Vol.), Environment Article § 5–301(g) (providing the standing requirements for contested case hearings), Maryland Code (1982, 2009 Repl.Vol.), Environment Article § 10–222(a) (providing the standing requirements for judicial review of contested cases), *Bryniarski v. Montgomery Cnty.*, 247 Md. 137, 143, 230 A.2d 289, 294 (1967). The former standard made it difficult for environmental organizations to

---

outside of MDE's jurisdiction, by challenging previous zoning approvals of the overall development or addressing sediment and erosion control and stormwater regulation implementation by Prince George's County. As far as we know, Petitioner took no such action.

establish standing to challenge environmental permits because an organization was required to have a distinct and separate property interest from its members. *Medical Waste Assocs. v. Md. Waste Coalition, Inc.*, 327 Md. 596, 612, 612 A.2d 241, 249 (1992). The 2009 amendments, however, provided that any person could seek judicial review of a covered final permit determination by the MDE as long as he/she/it met the "threshold standing requirements under federal law" and participated in the public comment process, unless there was no opportunity for public comment. Maryland Code (1982, 2007 Repl.Vol., 2010 Supp.) Environment Article § 5–204(f).

## B. Federal Standing Requirements

Under federal law, an appellant or petitioner possesses standing to challenge a final agency action when that person has suffered an injury in fact 1) that is concrete, particularized and actual or imminent, rather than conjectural or hypothetical, 2) traceable fairly to the challenged activity, and 3) that will be redressed likely, as opposed to speculatively, by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992). Environmental organizations have standing to sue when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610, 627 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383, 394 (1977)).

To demonstrate injury in fact, an appellant or petitioner need not show an injury to the environment, only an injury to his/her/its interests. *Laidlaw*, 528 U.S. at 181, 120 S.Ct. at 704, 145 L.Ed.2d at 627. An injury in fact includes ongoing or current harm to the appellant's/petitioner's interests, as well as threats of future harm caused by a challenged activity. Aesthetic, recreational, and economic values are judicially cognizable interests for the purposes of determining an injury

in fact; however, the fear of harm to these interests must be reasonable. *Laidlaw*, 528 U.S. at 183–84, 120 S.Ct. at 705–06, 145 L.Ed.2d at 629. Reasonableness depends on the facts of each case and requires courts to look at whether the appellant/petitioner uses the "affected area" of the permitted activity. *Laidlaw*, 528 U.S. at 181, 120 S.Ct. at 704, 145 L.Ed.2d at 627. The reasonable fear of harm must be related directly to harm of the appellant's/petitioner's interests; generalized concern for environmental degradation is not sufficient to meet the "concrete and particularized" test. *Lujan*, 504 U.S. at 575, 112 S.Ct. at 2144, 119 L.Ed.2d at 373–74. The magnitude of the harm is not relevant for the injury in fact inquiry; an "identifiable trifle" is sufficient to find standing. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254, 270 n. 14 (1973).

To demonstrate that the injury in fact is traceable fairly to the challenged activity under the permit, an appellant or petitioner must show that it is "likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir.2000) (Gaston Copper I). In other words, there must be a showing that there is a genuine nexus between the injury and the challenged conduct. *Gaston Copper I*, 204 F.3d at 161 (citing *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136, 119 L.Ed.2d at 364).

## II.

I agree that Linthicum's interests are germane to that of Petitioner; however, I do not agree that Linthicum demonstrated, on this record, that he suffered a concrete and particularized injury in fact or that his alleged harms are traceable fairly to the activities under the challenged permit. Even were I to agree that Linthicum's activities were within the affected area, or that his alleged harms could be traced to the activities allowed by the MDE permit, his fear of harm was not reasonable based on his affidavit and Circuit Court testimony.

## A. Affected Area and Traceability Determinations.

While injury in fact and traceability to the activity under the challenged permit are separate judicial inquiries, the underlying allegations and evidence often endeavor to support both. *Gaston Copper I*, 204 F.3d at 154. To determine whether an appellant/petitioner is within the affected area, a court should consider the type and source of the pollutant, the amount of the pollutant, and the distance from the person's allegedly impacted activities to the discharge. When all of the claims of harm, or threat of harm, to the person are prospective, as alleged by Linthicum, the court should evaluate the "facts" using a reasonableness standard.

### i. Type and Source of the Pollutant.

The case before the Court involves a nontidal wetlands and waterways permit that is different, and distinctly so, from the challenged activities in the cases relied on by the Majority opinion in its analysis, each of which involved potential or existing discharges of metals or other inherently toxic pollutants. To be sure, nutrients and sediments in excess also can cause environmental impacts, as detailed in the literature alluded to by the Petitioner. Nutrients and sediments, however, occur naturally in stream systems, sometimes in large amounts, in a dynamic relationship with the surrounding ecosystem. This is not the case with toxic metals such as mercury, where even small amounts, introduced through anthropogenic[3] sources, likely will cause harm or a reasonable fear of harm. A recent Eighth Circuit decision evaluated the affected area of a power generation plant where wetland and stream fill was authorized by a Clean Water Act § 404 permit.[4] *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978,

---

3. "Anthropogenic" means "of, relating to, or resulting from the influence of human beings on nature." Webster's Ninth New Collegiate Dictionary 90 (Frederick C. Mish et al. eds., 1989).

4. A Clean Water Act § 404 permit authorizes dredge or fill of wetlands and waterways in a manner substantially similar to the MDE nontidal wetlands permit in the instant case.

986 (8th Cir.2011). The utility company permittee argued, as the Respondent developer does in the instant case, that the plaintiffs were required to "show harm as a result of the particular activities authorized by the § 404 permit, rather than the overall construction of the plant." *Id.* The court agreed and evaluated the affected area and potential harm solely from the perspective of the activities authorized by the § 404 permit. *Sierra Club,* 645 F.3d at 986–89. One plaintiff, a private hunting club with an individual member who owned property adjacent to the plant site, was able to persuade the court that it had standing because light and noise pollution from the clearing of the land for the power transmission line harmed the member's aesthetic interests by changing the behavior of the local wildlife. *Sierra Club,* 645 F.3d at 987. Other hunting club members averred that they "enjoyed taking pictures, hunting and studying the history and archaeology of the area" adjacent to the plant site. *Sierra Club,* 645 F.3d at 987–88. The court concluded that the interests of the hunting club and its members were harmed by the activities authorized by the § 404 permit. *Sierra Club,* 645 F.3d at 988. The court also evaluated the standing claim of an environmental organization, the Sierra Club, that argued the affected area "is the plant site as well as the area in its immediate proximity...." *Sierra Club,* 645 F.3d at 988–89. The court agreed with the Sierra Club and conferred standing based on the district court's finding that bird watching and other recreational interests of the Club's members were injured "implicitly," at least in part, by the utility's § 404 activities. *Sierra Club,* 645 F.3d at 989. The court also relied upon the allegation that members of both groups were upset by the amount of mud and silt from the plant which the district court found was related directly to the § 404 permit. *Sierra Club,* 645 F.3d at 978.

This is the most recent Eighth Circuit case on point and is particularly informative in the present case for its analytical model. It involved a challenged activity similar to that of the developer here. Importantly, the federal court limited its review of the potential harm to the § 404 permit-authorized

activities, rather than the entire construction site. The Eighth Circuit likely limited the affected area determination for a § 404 permit to the area in immediate proximity to the site due to the uncertainty in determining cause-and-effect at any substantial distance from a dredged or filled wetland or stream. The Majority opinion in the present case, however, recites and relies on Linthicum's fear of development and impervious surfaces from the Woodmore Towne Center development. Maj. Op. at 305–06, 29 A.3d at 590–91 (2011). While these potential impacts may not be insignificant, they are upland land use changes primarily that are not within the scope of the MDE permit or the MDE's jurisdiction and, consequently, they do not support Petitioner's standing. Petitioner challenged the MDE permit based primarily on increases of nutrients and sediments. This Court should evaluate Linthicum's potential future harm proffers from the activities authorized by the MDE permit, not the larger Woodmore Towne Center development.

## ii. **Amount of the Pollutant.**

Neither the Circuit Court nor the Majority opinion analyzed the magnitude of the alleged impact as it relates to whether Linthicum was within the affected area. While federal courts indicate that the amount of the harm is not relevant particularly, so long as there is at least an "identifiable trifle," *SCRAP,* 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14, 37 L.Ed.2d at 270 n. 14, the scale of the permitted activity is relevant, as a threshold matter, to determining whether there is a threat of harm. The challenged permit here authorized less than one acre of nontidal wetland fill and placement of streams into oversized culverts to eliminate or minimize the impact of channelization. Even had Linthicum shown that these activities were an actual source of the pollutants he complains of, the amount of the pollutants, and therefore the scale of these impacts, in a watershed that is over 70,000 acres, appears minimal.

This case differs from the scenario in *Sierra Club* in that those plaintiffs were able to point to current impacts of the

§ 404 permit, including large amounts of silt and mud around the plant. *Sierra Club*, 645 F.3d at 978. Here, even after completion of the construction of the permitted activities, Linthicum did not see additional sediment, increased algae or other signs of nutrient enrichment, or any "changes visible to the human eye" as a result of the construction. While visual confirmation of environmental damage, such as excessive sedimentation, is not a requirement for an appellant or petitioner challenging prospective activities under MDE permits, this should be informative to this Court's evaluation, under the reasonableness standard, of Linthicum's showing. Additionally, the absence of a visual observation of the alleged harms should guide future trial and appellate court evaluations of other relatively small disturbances in wetland and waterway permit challenges, especially where solely aesthetic interests are claimed.

### iii. Distance from the Pollutant.

Federal cases have not articulated a clear standard for gauging distance from a pollutant discharge to a plaintiff's activities that defines the affected area; rather, the affected areas are highly dependent on the individual facts of each case. The largest affected area in the relevant federal cases was 40 miles downstream of a toxic discharge of mercury. *Laidlaw*, 528 U.S. at 183, 120 S.Ct. at 705, 145 L.Ed.2d at 628. In another case, however, a court declined to find injury in fact where the plaintiffs used a creek 18 miles downstream of an oil refinery's stormwater discharge. *Friends of the Earth, Inc. v. Crown Cent. Petrol.*, 95 F.3d 358, 361 (5th Cir.1996). The Fifth Circuit stated,

> At some point, however, we can no longer assume that an injury is fairly traceable to a defendant's conduct solely on the basis of the observation that water runs downstream. Under such circumstances, a plaintiff must produce some proof. . . .

*Crown Cent.*, 95 F.3d at 362. This reasoning applies well to the circumstances of the instant case where there is no

traditional discharge, just the alleged potential, at most, for long term, cumulative land use and hydrologic changes.

In yet another situation, the Fourth Circuit concluded that a plaintiff's activity, 16.5 miles downstream, was within the affected area of discharges of numerous heavy metals and chemical contaminants in excess of permitted limits. *Friends of the Earth v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 397 (4th Cir.2011) (Gaston Copper III). Another court found that a distance of two to four miles was not too far and "not so tenuous" for harm to the plaintiffs' interests from a discharge of pollutants where reports indicated regular exceeding of permit limits. *Friends of the Earth v. Chevron Chem. Co.*, 900 F.Supp. 67, 75 (E.D.Tex.1995). Four miles downstream of hog waste discharges was within the affected area when the plaintiff observed the water at that distance getting darker, increased algae, and dead fish floating in the water. *Am. Canoe Ass'n v. Murphy Farms*, 326 F.3d 505, 518 (4th Cir.2003).

Two Seventh Circuit cases involved pollution discharges into a lake, potentially a more static body of water. In one, the court found, based on the proposed permitted emissions from a nuclear facility, that a plaintiff's activity three miles away was within the affected area. *Sierra Club v. Franklin Cnty. Power of Ill.*, 546 F.3d 918, 925 (7th Cir.2008). In the other case, the court found that a plaintiff located 13 miles away from a bullet lead discharge into Lake Michigan was not within the affected area. *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 743 (7th Cir.2008) (stating that, "without some support for the assertion that he will be affected by the drift or polluted sediment or water, Pollack has not shown that he has standing to pursue this lawsuit").

Based on the wide ranges of distances from the challenged activities in the federal cases, it would be impossible to determine in the present case if 8.5 miles downstream of the wetland fill and stream culvert is, or is not, within the affected area, based on distance alone. In the instant case, there are no permit exceedances of any pollutants from a discrete discharge point and there are no specific allegations of toxic

chemicals or metals being released from the permitted activities. The relatively small size of the wetland and stream impacts, the large size of the Western Branch watershed, the natural occurrence and dynamic variability of nutrients and sediments in the natural environment, and the distance of 8.5 miles from the impact site to the closest point of the permitted activities and the nearest part of the Western Branch frequented by Linthicum convinces me that I cannot agree with the Majority opinion that Linthicum is within the affected area of this MDE permit or that the Circuit Court erred.

Petitioner asserts that another problem is that the wetland impacts, in concert with other similar impacts, present a cumulative harm to Linthicum's interest. Petitioner's argument finds support superficially in the Fourth Circuit's statement that a plaintiff "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged." *Gaston Copper I*, 204 F.3d at 161. Applying this theory to multiple upstream hog waste discharges, however, the court in *American Canoe* noted that traceability is a closer call when "third parties could also have contributed to the alleged injuries." *Am. Canoe Ass'n*, 326 F.3d at 520. In the present case, the challenged permit activity occurs in an urban environment where there are large numbers of unrelated sources of nutrient and sediment discharges, including developments, agricultural activities, wastewater treatment plants, and natural sources, that contribute a large volume of pollutants to the Western Branch. To countenance Linthicum attributing harm to his interests from less than one acre of wetland fill and several streams placed in culverts, 8.5 miles downstream from that relatively small impact, in a relatively large watershed, without some additional support or evidence that the challenged activity is in part actually responsible, is to render meaningless the traceability requirements of federal standing.

In other cases where the claimed environmental harm was prospective, as in this case, plaintiffs were able to show injury in fact by demonstrating that they had a reasonable fear of pollutants that would prevent them from visiting the affected

area or would lessen their aesthetic, recreational, or economic interest. In *Franklin Power*, an environmental organization challenged the proposed construction of a nuclear power plant and demonstrated standing satisfactorily with a prospective injury in fact through a member's statement that she would discontinue her biennial recreation trips due to fears that pollutants emitted by the plant would harm her and diminish her aesthetic enjoyment of the nearby lake. 546 F.3d at 925. In the present case, Linthicum has not stopped or slowed his recreation in the Western Branch since the construction under the permit was completed, and does not state that he intends to stop in the future. Petitioner emphasizes the cumulative and prospective nature of the harm in this case, as if to ask this Court to grant him flexibility in showing injury in fact due to the complexities of the overall situation.[5] In fact, the pleading requirements for future harm are relatively simple, as demonstrated in the *Franklin Power* case. Had Linthicum alleged that he would not return to his previously enjoyed recreation due to the permitted activity, the Petitioner would be closer to addressing the prospective harm element. Instead, Linthicum's affidavit and testimony speak to concerns and displeasure with future environmental degradation caused by cumulative urbanization in the upland areas of the watershed.[6] Thus, Petitioner failed to show that Linthicum's inter-

---

5. At oral argument, Petitioner stated that the case at hand is unlike *Laidlaw* and *Simpkins* in that there is no past harm, and that the Court needs to look into the future to determine the reasonableness of Linthicum's fear. When questioned, Petitioner indicated there is no factually analogous federal case to the case at hand.

6. Petitioner's brief does include a statement that Linthicum's wading in the Western Branch "will not be safe should the health and water quality of the Western Branch continue to degrade." This is not persuasive on the issue of prospective injury in fact as there are no alleged or actual discharges of chemicals or pollutants that are harmful to human health or would prevent safe wading in the downstream areas in the future. Petitioner also uses this opportunity to compare the eventual fate of the Patuxent River to the current conditions of the Anacostia River. This is another reference to the sequelae of urbanization, rather than a reasonable or likely consequence of the wetlands permit in question.

ests were in the affected area and that the alleged harms were traceable to the permit activities.

## B. Petitioner's Pleadings and Testimony in the Circuit Court.

Linthicum's affidavit leaves little room to wonder whether he has genuine aesthetic, recreational, and economic interests in the mainstem of the Western Branch, 8.5 miles downstream of the area where the on-site streams were culverted and wetlands filled. A problem with the Majority opinion is that it takes Linthicum's alleged interests and imparts harm to these interests without requiring Linthicum to supply the correlative evidence himself. This Court should require that an appellant/petitioner make a reasonable showing of harm, based on the actual facts of the permitted activity.[7] Neither Riverkeeper's pleadings nor Linthicum's affidavit or additional testimony made a threshold showing of injury in fact or traceability.

Under *Laidlaw*, the relevant showing of harm for standing falls on the plaintiff, not the environment. 528 U.S. at 181, 120 S.Ct. at 704, 145 L.Ed.2d at 627. The bulk of Linthicum's affidavit was focused on the potential environmental degradation posed by generic "urbanization," rather than the specific potential harm of the permitted activity. For example, he stated that "the wetlands permit ... will cause impacts to wetlands and streams in the Western Branch ...," that the "health of the Western Branch ... will suffer as a direct result of the impacts ...," that "diverting and/or compromising streams on the Subject Property *can* affect the flow rate

---

7. In federal fora, courts require plaintiffs to show their injury in fact as "not mere pleading requirements but rather an indispensable part of the ... case, each element must be supported ... with the manner and degree of evidence required at the successive stages of the litigation." *Pollack v. U.S. Dept. of Justice*, 577 F.3d 736, 744 (7th Cir.2009) (quoting *Sierra Club v. Franklin Cnty. Power of Ill.*, 546 F.3d 918, 925 (7th Cir.2008) and cases therein). When the defendants in the case "challenged the *factual* basis for the plaintiffs' standing to sue, [plaintiff] was required to present some competent proof of his injuries, and his proof is subject to refutation by the defendants." *Pollack*, 577 F.3d at 745.

and ecology of the tributaries ...," and that "drainage of stormwater from the impervious surfaces of the Woodmore Towne Center development into the surrounding streams and watershed will further degrade the water quality of the Western Branch." (emphasis added). These are examples of Linthicum's genuine interest in, and concern for, the environment, based on generalized and assumed impacts related to urbanization. They do not explain, however, how these generalized environmental harms cause an injury to Linthicum himself. His affidavit went on to state how "impacts to wetlands on the Subject Property will also have a negative effect on my activities downstream ...," but followed this statement with generalized concern for environmental degradation, rather than link the harm to his personal interests.

Linthicum's testimony in the Circuit Court expanded on the themes of his affidavit, but continued to fail to demonstrate how the environmental degradation he attributed to the MDE permit harmed, or threatened to harm, his own interests. He stated that he was "impacted by the damage done on the site down river, whether it's nutrients, whether it's sedimentation, pollutants" and that

> it's very well established that what happens 10, 20, 100 miles up river [a]ffects the down river, and in this case, [a]ffects me personally on the western branch. It's a cumulative effect, as you know.

This is just the sort of "water runs downhill" line of reasoning warned against by the court in *Crown Central*, 95 F.3d at 362. Linthicum should have made a more concrete and particularized showing of how the nutrients, sediments, or pollutants, after they inevitably flow downstream, acted, or will act, to harm his particular interests.

When questioned by opposing counsel during the Circuit Court proceeding, Linthicum admitted that he did not know the amounts of wetlands being filled under the permit, he had not seen the actual permit itself or the associated drawings of the impact or location of the work, and did not know any facts specific to the permit itself. While this Court should not

require individual appellants or petitioners asserting standing in judicial review actions to be engineers or scientists, or even to adduce expert witness testimony, we should require them to have some knowledge of and familiarity with the actual permit they are challenging and understand somewhat the nature and magnitude of the activities to be conducted under the permit. Respondent developer produced substantial amounts of engineering and scientific studies that were submitted to the MDE during the permit process. These documents included hydrology studies that speak to one of Linthicum's concerns about the flow rate of the streams that were culverted, as well as the potential for future flooding. When information regarding the actual nature of the challenged activity is available, potential challengers to environmental permits should be required to be familiar with this information in expiation of their burden to demonstrate their standing in light of that information. This blatant disregard of available information in this record speaks to the patent unreasonableness of Linthicum's fears.

When asked directly why the permit matters to him, Linthicum stated:

> You see the degradation, you see the aforementioned death by a thousand cuts, and you realize that a permit for 250 acres here, in and of itself is one thing, but then another one and another one and another one and another one.

He stated further that there is a "direct cause and effect" between the urbanization and impervious surfaces, like the development at Woodmore Towne Center and the lower parts of the watershed that he frequents. Death of, desertification,[8]

---

**8.** Although there is some controversy within the relevant scientific communities over the proper definition of the word "desertification," the most widely accepted definition seems to be that of the United Nations Convention to Combat Desertification which defines the word as "land degradation in arid, semi-arid and dry sub-humid areas resulting from various factors, including climatic variations and human activities." *Combating Desertification A Glossary*, United Nations Convention to Combat Desertification, http://www.unccd.int/library/menu.php?newch=l82 (last visited Sept. 9, 2011). As employed by Linthicum in the context of the present case, I find his use of this word to be hyperbolic and inappropriate.

and adverse impacts on the downstream area are alleged by the Petitioner to be the direct result of the challenged permit, however, these assertions are not directed towards the activities allowed under the permit and the wetland and stream impacts, but rather the general result of urbanization or pointed towards the greater Woodmore Towne Center.[9] Theses repeated vague themes are Petitioner's substitute for actual knowledge of the permitted activity and critical analysis of the real effects of the permitted activity. For impacts related to wetland permits, as opposed to toxic or metals discharge points, the connection is less clear and may be challenging for appellants/petitioners to prove. Despite this, potential challengers should not be encouraged to use general scientific studies about the impacts of urbanization, channelization, or impervious surfaces as a substitute, rather than a supplement, for explication of genuine and reasonable fears flowing from the proposed activity.

In summary, Linthicum asks this Court to equate any impact or harm to the environment from cumulative development or urbanization in the Western Branch watershed with harm to him personally. This is simply not reasonable. This would allow any appellant/petitioner or organization who uses or appreciates environmental or natural resources to say that environmental degradation is per se harm to them. I agree that, in a broad sense, urbanization can cause environmental degradation. Where I do not agree with the Majority opinion is that Linthicum, through his affidavit or testimony on this record, has shown how the permitted activity has caused, or will cause in the future, any harm to his interests. Even under the broader federal standing requirements, an appellant or petitioner must make a specific showing of how a challenged activity harms him/her/it personally, aside from his/her/ its love and devotion to the environment. "Death by a thousand cuts" is not an injury in fact. I would affirm the

---

9. In his Circuit Court testimony, Linthicum explained that death and desertification of a stream results from high percentages of impervious surfaces in the watershed that cause rain to runoff quickly after a storm, leading to little or no flow in the stream.

judgment of the Circuit Court for Prince George's County dismissing Petitioner's judicial review action for lack of standing.

Judge MURPHY authorizes me to state that he joins in the views expressed here.