In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3857

STEVEN B. POLLACK AND BLUE ECO LEGAL COUNCIL,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES DEPARTMENT OF JUSTICE, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08-CV-00320—**Ronald A. Guzmán**, *Judge.*

ARGUED MAY 8, 2009—DECIDED AUGUST 13, 2009

Before CUDAHY, MANION, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.* The United States govern-ment operates a gun range on the shores of Lake Michi-gan. The plaintiffs brought suit against several govern-mental agencies, alleging that the discharge of bullets into the lake violates various environmental laws. The district court dismissed the suit for want of jurisdiction after concluding the plaintiffs lacked constitutional stand-ing. The plaintiffs appeal, and we affirm.

I.

In 1918, the United States Navy and Marine Corps began operating a gun range in North Chicago, Illinois. Over the years, many discharged lead bullets from the range landed in an area of Lake Michigan covering 2,975 acres. The military used the site until 1976 when the Federal Bureau of Investigation ("FBI") leased the range. The FBI bought the site in 1987. At some point the range was improved by adding an earthen berm backstop to prevent bullets from landing in the lake. Despite the berm, some bullets escaped into Lake Michigan and nearby Foss Park.[1]

In addition to this gun range, the government also operated a shotgun range on the site. Pellets from the shotguns landed in Lake Michigan. However, the government no longer operates a shotgun range there. Additionally, in 2006 the United States Coast Guard conducted live-fire exercises from boats on Lake Michigan using lead bullets and bullets from those exercises landed in the water. Lead is a toxic substance and, if ingested in sufficient quantities, poses a threat to human health.

Plaintiff Steven Pollack is an attorney who lives in Highland Park, Illinois, thirteen miles south of the range.

---

[1] After the FBI learned of bullets entering Foss Park, it closed the range in April 2008. The FBI improved the range and undertook further studies to prevent bullets from entering the park. According to a May 11, 2009, letter sent to the court, the FBI intends to reopen the range at the earliest possible date.

He is the executive director of plaintiff Blue Eco Legal Council ("Blue Eco"), an environmental group "with an interest in the environmental safety of the Great Lakes watershed," that, among other things, sues private and governmental polluters to enforce environmental laws. Pollack and Blue Eco brought this suit against the United States Department of Justice, the United States Coast Guard, the United States Department of the Navy, the United States Marine Corps, and the United States Department of Defense. The plaintiffs alleged that the deterioration of the lead bullets in the water harmed the environment, in violation of the Clean Water Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation, and Liability Act, and state nuisance law. Pollack and Blue Eco sought $55.2 million in damages: $35.2 million to pay a private company to remove bullets from the lake bottom and $20 million in tort damages for public nuisance to fund a "supplemental environmental project" to be administered by environmental groups chosen by the court.

To establish standing, the plaintiffs relied on affidavits submitted by Pollack and another Blue Eco member, Darren Miller, who is also a resident of Highland Park. Pollack's affidavit stated that he enjoyed watching birds in the Great Lakes watershed, visited public parks along the Lake Michigan shoreline, drank water from Lake Michigan at his home in Highland Park, and ate freshwater and ocean fish. Miller's affidavit was nearly identical to Pollack's.

The defendants moved for dismissal under Federal Rule of Civil Procedure 12(b)(1), arguing that the court lacked

subject-matter jurisdiction because Pollack and Blue Eco did not possess constitutional standing to assert their claims. The district court granted the motion, concluding first that Pollack and Miller's concern over drinking water did not provide standing because the drinking water in Highland Park was below the environmental limit on lead pollution allowed by the city government, thereby negating any claim of harm by Pollack and Miller. Moreover, the district court held that their concerns over birds, fish, and wildlife were too general and did not allege any particular or specific harm that had been caused by the bullets. The district court concluded that because Pollack and Miller did not possess standing, Blue Eco did not possess standing on their behalf. Accordingly, the district court dismissed the suit for lack of subject-matter jurisdiction. The plaintiffs appeal.

## II.

At issue in this case is Pollack's and Blue Eco's constitutional standing to bring this lawsuit. Under Article III of the Constitution, federal courts are limited to hearing "Cases" and "Controversies." This provision limits the judicial power "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1148 (2009). This restriction on the power of the courts "'is founded on concern about the proper—and properly limited—role of the courts in a democratic society.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

Permitting a court to decide a case where the plaintiff does not have standing would "allow[] courts to oversee legislative and executive action" and thus "significantly alter the allocation of power . . . away from a democratic form of government." *Id.* at 1149 (quotation omitted).

In order to show standing,

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Id.*; *accord Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir. 2008). An organization has standing when any of its members has standing, the lawsuit involves interests "germane to the organization's purpose," and neither the claim asserted nor the relief requested requires an individual to participate in the lawsuit. *Sierra Club*, 546 F.3d at 924. At issue here is (a) whether Pollack has standing; and (b) whether Blue Eco has standing through Pollack or Miller. The plaintiffs bear the burden of proving standing. *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004). We review a district court's decision on standing de novo. *Id.*

Several Supreme Court decisions guide our analysis. In *Summers*, several environmental organizations challenged a decision of the United States Forest Service to permit a salvage sale of 238 acres of timber in Sequoia National

Forest that had been damaged in a fire, without providing notice, a period for public comment, or an appeal process. 129 S. Ct. at 1147-48. The Forest Service acted according to its own regulations, which permit it to exempt from these requirements salvage sales of timber located on less than 250 acres. *Id*. at 1147. The environmental organizations filed suit to challenge the regulations. *Id*. at 1149. The organizations contended they possessed standing based on their members' "recreational interest in the National Forests." *Id*. at 1149. The government conceded that one member of the organizations had standing to challenge the sale of the 238 acres and the parties settled the claim relating to that particular salvage sale. *Id*. The organizations still asserted the facial challenge to the regulations themselves. The organizations submitted an affidavit of Jim Bensman, who asserted "that he has visited many National Forests and plans to visit several unnamed National Forests in the future." *Id*. at 1150. *Summers* held that this affidavit was insufficient to provide standing, stating that it failed "to allege that *any* particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan of Bensman's to enjoy the National Forests." *Id*. Although Bensman's affidavit did reference particular sales in the Allegheny National Forest, there was no "firm intention" to visit that area. *Id*. *Summers* stated that "[t]his vague desire to return is insufficient to satisfy the requirement of imminent injury." *Id*. at 1150-51.

Conversely, the Supreme Court found standing to sue in *Friends of the Earth, Inc. v. Laidlaw Environmental Services*,

528 U.S. 167 (2000). In *Laidlaw*, a wastewater treatment plant obtained a state permit to discharge treated water containing known pollutants into a river. *Id*. at 175-76. Three environmental organizations sued, basing their standing on members affected by the pollution. For example, one member stated that she lived two miles from the river and that she had picnicked, walked, watched birds, and waded in the river before the pollution and because of the pollution had since ceased those activities. *Id*. at 182. *Laidlaw* held that this and similar statements "adequately documented injury in fact." *Id*. at 183. *Laidlaw* explained that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id*.

On the other hand, the Supreme Court held that environmental plaintiffs did not have standing in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). In *Lujan*, an environmental organization challenged a governmental action that allegedly opened public lands for mining. *Id*. at 879. The affidavit of one member stated:

> My recreational use and aesthetic enjoyment of federal lands, particularly those *in the vicinity* of South Pass-Green Mountain, Wyoming have been and continue to be adversely affected in fact by the unlawful actions of the Bureau and the Department. In particular, the South Pass-Green Mountain area of Wyoming has been opened to the staking of mining claims and oil and gas leasing, an action which threat-

ens the aesthetic beauty and wildlife habitat poten-
tial of these lands.

*Id*. at 886 (emphasis added). *Lujan* held that standing was
not established by "averments which state only that one
of respondent's members uses unspecified portions of
an immense tract of territory, on some portions of
which mining activity has occurred or probably will
occur by virtue of the governmental action." *Id*. at 889.

In addition to these Supreme Court cases, Pollack
directs our attention to our recent decision in *Sierra Club
v. Franklin County Power of Ill.*, in which we held that
an environmental organization possessed standing to
seek an injunction against a power company that had
obtained a state permit to build a coal power plant in
southern Illinois. 546 F.3d at 923. The environmental
organization claimed standing based on a member who
had vacationed every two years since 1987 on a lake
three miles from the proposed site. *Id*. at 925. The
member stated that she fished, kayaked, camped, and
enjoyed the beauty of the lake, and that she would cease
her trips if the power plant was built. *Id*. *Franklin County*
held that the member had established injury-in-fact
based on her "likely exposure" to pollutants from the
coal power plant and the cessation of her vacation trips.
*Id*. at 925-26. Moreover, the claimed injury was fairly
traceable to the proposed power plant. Although the
extent of pollution was unclear, we stated:

> We agree that no one knows the ultimate magnitude of
> McKasson's injury—for example, we don't know if
> the particulate matter from the plant will blot out the

sky or merely create a thin haze that's not visible to the naked eye, or if the airborne mercury will actually spread 45 miles to poison fish that McKasson currently consumes from a pond near her home (which is another harm she claims she will suffer). We do know, however, that the plant will release some pollutants and that McKasson believes these pollutants will ruin her ability to enjoy Rend Lake and taint the surrounding area.

*Id*. at 927. Accordingly, we held that the member and thus the plaintiff organization had standing to challenge the building of the power plant.

Pollack also relies heavily on *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000), in which the Fourth Circuit held that two individuals had standing to sue a smelting plant that was dumping pollutants upstream from them. One individual owned a home on the affected water where he fished, swam, and boated. *Id*. at 152-53. Another individual operated a canoeing company on the polluted river. *Id*. at 153. Based on these individuals' standing, *Gaston Copper* held that their organizations had standing to challenge the release of the pollutants. *Id*. at 160.

As noted above, in this case Blue Eco bases its standing on nearly identical affidavits from two of its members, Pollack and Miller. Pollack essentially claims four injuries: (1) that he drinks water drawn from Lake Michigan for Highland Park and "other local municipalities" and the shooting of lead bullets pollutes this water; (2) that he enjoys "watching wildlife in the Great Lakes water-

shed" and that he "is concerned" about the effect on birds from the shooting; (3) that he enjoys "the public areas along the Illinois portion of Lake Michigan" and he is concerned that people in Foss Park and the adjoining beach will be hurt, thereby making it "less likely that [he] will visit" that park; and (4) that he enjoys "eating fresh-water and ocean fish" and he is concerned that bullets fired into the water will "enter[] the water column and bio-accumulat[e] in the tissues and organs of fish," thereby lessening his desire to eat fish.

Pollack's intention to drink water and his fear that his water has been contaminated by lead from bullets does not give rise to standing. He relies on *Franklin County* and *Gaston Copper* to argue that his drinking water taken from Lake Michigan gives him standing. However, this case is materially distinguishable from those because Pollack is not downstream from the alleged pollutants and it is unclear whether their presence affects him. In *Gaston Copper*, the individuals were downstream from the entry point for the pollutants. Here, the ricocheting bullets from the Foss Park site and the shotgun range enter Lake Michigan at North Chicago, Illinois. Highland Park is approximately thirteen miles from North Chicago and draws its water from a different section of Lake Michigan than North Chicago. It is unclear if any pollution from bullets discharged into Lake Michigan will travel the thirteen miles from Foss Park to Highland Park. To clarify this point, Pollack alleges that sediment in the region travels in a counter-clockwise direction, from Foss Park to Highland Park, and cites a report of the Environmental Protection Agency. However, that report does not

suggest that such a pattern of movement exists. *See* U.S. Envtl. Prot. Agency & Gov't of Canada, The Great Lakes: An Environmental Atlas and Resource Book, ch. 2, § 4 (3d ed. 1995), *available at* http://www.epa.gov/glnpo/atlas/index.html. Hence, Pollack has not satisfied his burden of showing that decaying bullets near North Chicago will affect his water supply in Highland Park. Pollack's belief that the bullets affect him is also unlike the air pollution at issue in *Franklin County*, because it is commonly understood that air pollution can travel three miles through the air and different wind conditions could easily blow the pollution onto land at that distance. In contrast, it is not readily apparent that Pollack would be affected by the shooting at issue here.

Taken to its extreme, Pollack's argument would permit any person living on or near Lake Michigan to assert that he has been harmed by the bullets, because the lead could potentially have been carried to every part of the lake. However, *Lujan* makes clear that when a vast environmental area is involved and the pollution affects one discrete area while a plaintiff intends to visit a different discrete area, that plaintiff does not have standing. Similarly, Pollack drinks treated water from one discrete area while the defendants' activities affect a different discrete area. Without some support for the assertion that he will be affected by the drift of polluted sediment or water, Pollack has not shown that he has standing to pursue this lawsuit. Thus, because it is not readily apparent that Pollack would be affected by the discharge of bullets, he does not have standing based on Highland Park's drinking water taken from Lake Michigan.

Similarly, Pollack has failed to connect his desire to eat fish with the bullets in the water. For one, his desire to eat ocean fish is not implicated because Lake Michigan is not the ocean. Moreover, Pollack never avers that he will eat fish from Lake Michigan itself; instead, he refers generally to "freshwater fish." Hence, Pollack has not even claimed that he will eat fish from the affected region. This statement is unlike *Laidlaw* and *Franklin County*, where the individuals actually used the areas affected by pollution. Indeed, Pollack's averment that he eats freshwater fish from some unnamed source is less suggestive of standing than the statements in *Lujan* and *Summers*, where the individuals at least visited the general region affected by pollution. Accordingly, Pollack's intention to eat freshwater fish from an unspecified source does not provide a basis for standing to sue.

Pollack's desire to view wildlife and to visit local parks may both be considered a claim that he will suffer aesthetic harm from the gun range. While the Supreme Court clearly recognizes that aesthetic harms may give rise to standing, *Summers*, 129 S. Ct. at 1149, *Lujan* and *Summers* demonstrate that a plaintiff must show that he has actual aesthetic interest in the area affected by the pollution. When governmental action affects a discrete natural area, and a plaintiff merely states that he "uses unspecified portions of an immense tract of territory," such averments are insufficient to establish standing. *Lujan*, 497 U.S. at 889. Here, Pollack claims generally that he enjoys watching birds in the "Great Lakes watershed" and visiting public parks "along the Illinois portion of Lake Michigan." However, he never claims that he visits Foss

Park or watches birds in that area.[2] Instead, Pollack claims that he visits parks and watches birds within a vast territory. This claim is similar to the statements in *Lujan* and *Summers*, where the individuals never claimed to have a specific interest in the actual area affected by pollution. *Summers*, 129 S. Ct. at 1150; *Lujan*, 497 U.S. at 886. Pollack fails to demonstrate that his interest in bird-watching along an unspecified portion of the Great Lakes watershed—a region stretching from Minnesota to New York—will be affected by the shooting activities in a confined area of North Chicago. Similarly, the section of Lake Michigan bordering Illinois stretches for approximately 70 miles, and Pollack never specifies where along that shoreline he visits. Accordingly, his generalized statements that he visits the Illinois shoreline of Lake Michigan and watches birds in the Great Lakes watershed do not give rise to standing to challenge the shooting activities at issue here.

In short, Pollack's and Miller's interests are too generalized to give rise to standing. "At bottom [the plaintiffs] appear to seek the simple satisfaction of seeing the [environmental] laws enforced." *Jaramillo v. FCC*, 162 F.3d 675,

---

[2] Although Pollack visited Foss Park after he commenced suit, a plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterwards. *Laidlaw*, 528 U.S. at 180 (stating that the court considers whether a plaintiff had standing "at the outset of the litigation"); *Perry v. Village of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) (stating that "[t]he requirements of standing must be satisfied from the outset").

677 (D.C. Cir. 1998). However meritorious their case may be, the plaintiffs lacked a constitutional basis to bring this lawsuit.

### III.

Because neither Pollack nor Miller has demonstrated that they were concretely affected by the shooting activities they challenge, neither individual has standing to pursue this case. Accordingly, neither Pollack nor Blue Eco has standing. The district court's dismissal of this suit for lack of subject-matter jurisdiction is AFFIRMED.

CUDAHY, *Circuit Judge*, concurring. This is without question a close case. As the case law laid out by the majority suggests, "injury in fact" can be an elusive phenomenon. Although in the present case an injury is arguably traceable to the deposit of toxic substances in potable water, such phenomena appear and disappear from one case to the next depending on subtle twists in the allegations, turning between the real and the hypothetical. *Compare generally Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (Scalia, J.), *and Summers v. Earth Island Institute*, 129 S.Ct. 1142 (2009) (Scalia, J.), *with Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) (Ginsburg, J.). I write separately

to make the point that the Supreme Court's case law on this subject is both unclear in purpose and extraordinarily difficult to reconcile. Close cases like this one ought to make that point clearly. In particular, where a citizen-suit provision potentially sets the bar for proving the merits lower than the bar for proving standing, it is incumbent upon us to carefully examine why the plaintiff before us either has or has not established "injury in fact." Perhaps more important, this plaintiff's case has procedural flaws not addressed by the majority.

The Clean Water Act includes a citizen-suit provision stating that "any citizen may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). An "effluent standard or limitation" is defined to include any term or condition of an approved permit. *See id.*, § 1365(f). Citizens are therefore authorized to bring suit against any NPDES permit holder who has allegedly violated its permit. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000). The Act also includes a statutory standing requirement, which defines "citizen" as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). Congress has explained that this standing requirement confers standing to its constitutional limits. *See Gaston Copper*, 204 F.3d at 152 (citation omitted). Even so, the broad nature of the citizen-suit provision means that in many cases, like this one, the real test will be proof of standing, not of the merits.

To have standing under the "case or controversy" requirement of Article III of the Constitution, an individual must show an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical; that the injury is traceable to the challenged action; and that it is redressable. *Defenders of Wildlife*, 504 U.S. at 560–61; *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 925 (7th Cir. 2008) (*Franklin County Power*). "Because these elements 'are not mere pleading requirements but rather an indispensable part of the . . . case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'" *Franklin County Power*, 546 F.3d at 925 (quoting *Defenders of Wildlife*, 504 U.S. at 561).

Though the test for showing injury in fact is easy enough to state, it is almost hopelessly confusing to apply. We are told that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). "Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Defenders of Wildlife*, 504 U.S. at 562–63 (citing *Morton*, 405 U.S. at 734). But the injury in fact test requires more than an injury to a cognizable interest. It requires that the plaintiff be "among the injured." *Id.* Nevertheless, the "'injury-in-fact necessary for standing need not be large, an identifiable trifle will

suffice.' " *Franklin County Power*, 546 F.3d at 925 (quoting *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002)) (further internal quotation marks and citations omitted). These statements raise more questions than they answer. What is the "affected area"? How do we determine whether someone's aesthetic or recreational values will be "lessened" other than by their say-so? What counts as a "trifle" sufficient to place someone "among the injured"?

This guidance is particularly difficult to follow where the plaintiff is on the bubble: Pollack does not live in North Chicago, where the drinking water is concededly drawn from the "affected area" of the lake, but he doesn't live in East Chicago[1] either, or even as far as Evanston.[2] Is Highland Park, thirteen miles away, close enough to be "among the injured"?

The majority recites the relevant case law without really engaging with it in a way that gives an answer to this question. The majority quotes *Franklin County Power* at length, for instance, including the court's explanation that, although "we don't know if the particulate matter from the plant will blot out the sky or merely create a thin haze that's not visible to the naked eye, . . . . [w]e do know . . . that the plant will release some pollutants and that McKasson believes these pollutants will ruin her ability to enjoy Rend Lake and taint the surrounding area." *Franklin County Power*, 546 F.3d at 927. The same can be

---

[1] East Chicago, Indiana is 60 miles south of the gun range by car.

[2] Evanston, Illinois is 26 miles south of the gun range.

said here—we know that the gun range has discharged lead in the lake, and we know that Pollack believes that lead in the lake will ruin his ability to enjoy drinking his water, eating fish and watching waterfowl in the Great Lakes watershed. In fact, this case is arguably an easier case for standing than *Franklin County Power*. There, the power plant in question had yet to be built—the injury was, almost by definition, hypothetical. Here, not only has the firing range admitted to discharging lead into the lake, it has admitted to doing so without a permit over the course of decades. And whatever else can be said about Pollack's injury, it is beyond cavil that lead is a toxic substance that even in very small amounts causes harm when ingested by the human body. The majority appears to depart from *Franklin County Power*'s capacious standard, and to settle on a narrower, more demanding requirement.

This is particularly unfortunate here, where the plaintiffs' case is flawed for procedural reasons that may not require us to revisit *Franklin County Power*'s recent pronouncements on standing. The plaintiffs arguably failed to meet their burden of proof. Pollack correctly argues that he need not show environmental degradation to establish standing for a permit violation under the Clean Water Act. *See Gaston Copper*, 204 F.3d at 159. "[T]he Supreme Court does not require such proof." *Id. Gaston Copper* explained that in *Laidlaw*, the Court found that "several citizen affidavits attesting to reduced use of a waterway out of reasonable fear and concern of pollution 'adequately documented injury in fact.'" *Id.* (quoting *Laidlaw*, 528 U.S.

at 183). "The Court required no evidence of actual harm to the waterway . . ." *Id.* Nevertheless, because the defendants here have challenged the *factual* basis for the plaintiffs' standing to sue, Pollack was required to present some competent proof of his injuries, and his proof is subject to refutation by the defendants.

On a factual challenge to a plaintiff's standing, "'the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, at *3 (7th Cir. 2009) (quoting *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008)) (further internal quotation marks and citations omitted). Indeed, "'the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Id.* (quoting *Mortenson v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Again, it is undisputed that the defendants regularly discharged lead bullets into Lake Michigan without a permit and that lead is a toxic chemical that can affect drinking water. The narrow question is whether Pollack had a "reasonable fear" that *his* drinking water was unsafe.

Pollack presented evidence of the "dynamic nature" of the waters in Lake Michigan, suggesting that the lead in the water next to North Chicago can migrate thirteen miles south to Highland Park. The majority brushes this evidence aside, stating that the EPA report Pollack offered in support does not say what he said it says. The majority asserts that "it is commonly understood that air

pollution can travel three miles through the air . . . . [but] it is not readily apparent that Pollack would be affected by the shooting at issue here." *Supra* at 11. The majority goes outside the record and cites no authority for its assertion regarding what is commonly understood about air pollution. Even accepting this assertion, it is also commonly understood (at least among boaters in Lake Michigan) that the currents at the foot of the lake, as distinguished from the larger body of water generally, *do* travel counter-clockwise at least part of the year, and therefore the plaintiffs' logic does not implicate the entire lake or every point on its shoreline. It also misses the mark to take Pollack's argument "to its extreme" and to posit whether someone on the other side of Lake Michigan would have standing here—Pollack is the plaintiff before us, and the facts and circumstances of his case, namely his distance thirteen miles from the source of pollution, are what we must address. Setting all of that aside, the district court *assumed* that Pollack's assertions regarding the lake's currents were true. It is not for us to find otherwise.[3]

More to the point is the fact that the defendants presented *their own evidence* tending to rebut what little

---

[3] The majority also focuses on the fact that the lead level in Highland Park's water is not high enough to violate federal standards. This may be beside the point, given that Pollack was not required to show *any* environmental degradation to satisfy the requirements of standing. *See Gaston Copper*, 204 F.3d at 160. Lead is toxic in any amount, and the administrative limit cited by the majority is a practical rather than an ideal ceiling.

evidence that Pollack did put forth. The defendants showed not only that Highland Park (unlike North Chicago) draws its drinking water from intakes outside the roughly 3,000-acre area presumably affected by the firing range, but also that Highland Park and North Chicago have attributed the small amount of lead in their drinking water to corrosive pipes, not to the firing range at issue here. In this respect, then, our case is unlike *Gaston Copper*, where there was competent evidence that the pollutants in question would travel more than 16 miles downstream, passing through the plaintiff's private lake on the way. Here, Pollack's limited evidence that lead has traveled or will travel south to Highland Park and enter the plaintiff's drinking water was outweighed in the view of the district court by the defendants' evidence of an alternative cause for lead in the water—the corrosive pipes just mentioned. The district court properly exercised its fact-finding role and concluded that the defendants had rebutted Pollack's evidence of standing. *See Apex Digital, Inc.*, 572 F.3d 440, at *3. This is what really seems to tip the balance in Pollack's case.

Perhaps what we can say here, then, is that the farther the plaintiff is from the "area of injury," the more evidence he generally must put forth to prove that he is "among the injured." Perhaps, however, this case resolves as it does merely because of the procedural turns it took. If the defendants had made a facial challenge rather than a factual challenge to Pollack's standing, or if Pollack had put forth more evidence of lead's likelihood of traveling thirteen miles south from North Chicago, then the complaint may have withstood

the motion to dismiss. The caselaw is so unclear, however, that we cannot say more than that.

Pollack's claims regarding aesthetic and recreational injuries are less persuasive and the majority addresses them adequately. Pollack does not allege that he uses the *affected area*. *See Laidlaw*, 528 U.S. at 183 (quoting *Morton*, 405 U.S. at 735). Instead, he says he enjoys watching the wildlife "in the Great Lakes watershed," and that he uses public areas "along the Illinois portion of Lake Michigan," and that he enjoys "eating freshwater and ocean fish." These interests are *far* broader than an interest in the area affected by the firing range, however that area might be defined. As the district court pointed out, and the majority reprises, the Illinois shoreline Pollack claims to use is 61 miles long, and the Great Lakes watershed encompasses all five of the Great Lakes and is 750 miles wide. Pollack never alleges that he used the beach at Foss Park, adjacent to the range, or any beach near there.

Pollack's averments are thus barely—but only barely—insufficient to establish injury in fact, and unfortunately may impair the salutary significance of *Franklin County Power*.

For these reasons, with some reluctance, I concur.