In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2723

RON JOHNSON and BROOKE ERICSON,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT and KATHERINE ARCHULETA, Director of the Office of Personnel Management,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:14-cv-00009 — **William C. Griesbach**, *Chief Judge*.

ARGUED JANUARY 21, 2015 — DECIDED APRIL 14, 2015

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. The Office of Personnel Management ("OPM") negotiates and regulates health benefit plans that are offered to federal employees. Most federal employees receive these benefits through the Federal Employee Health Benefits Program ("FEHBP"). Prior to the passage of the Patient Protection and Affordable Care Act ("ACA"),

Pub. L. No. 111-148 (2010), members of the U.S. Senate and House of Representatives, as well as their staff members, were eligible for FEHBP insurance plans, just like other federal employees. A provision of the ACA, however, limited the health care options available to members of Congress and their staffs, mandating that the only health plans that the federal government could make available to those individuals were plans created under the ACA or offered through a health insurance exchange established under the ACA; they could no longer receive insurance through the FEHBP. *See* 42 U.S.C. § 18032(d)(3)(D).

Following the passage of the ACA, OPM conducted notice-and-comment rulemaking to implement this provision of the ACA, and issued the final rule, 78 Fed. Reg. 60653-01, that is at issue in this case. The plaintiffs, United States Senator Ron Johnson, of Wisconsin, and his legislative counsel, Brooke Ericson, filed suit in federal court to enjoin the enforcement and implementation of the OPM rule. They contend that the rule is contrary to the ACA and other law because it allows the government to make pre-tax employer contributions to non-FEHBP plans and makes members of Congress and their staffs eligible for an ACA insurance exchange reserved for small businesses.

The defendants—OPM and its director, Katherine Archuleta (collectively, "OPM")—moved to dismiss, arguing that the plaintiffs lack standing to bring this suit. The district court granted the motion, finding that the plaintiffs had not identified a judicially cognizable injury that is traceable to the aspects of the OPM regulation that they challenge. We affirm.

## I. Background

The federal government offers employer-sponsored group health insurance to its employees pursuant to the Federal Employees Health Benefits Act of 1959 ("FEHBA"), 5 U.S.C. § 8901–8914. *See Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 682 (2006). That insurance is provided through the FEHBP. The FEHBA "assigns to OPM responsibility for negotiating and regulating health-benefits plans for federal employees." *Id*. at 683. The government pays for up to seventy-five percent of the premiums for plans provided through the FEHBP, 5 U.S.C. § 8906(b)(1)–(2), and those contributions, like all employer contributions to employer-sponsored group health insurance, are tax free.

Members of Congress and their staffs (collectively, "Members") are among those defined by the FEHBA as federal employees, 5 U.S.C. § 8901(1)(B)–(C), and, prior to the 2010 enactment of the ACA, those individuals were eligible for health plans offered through the FEHBP. The ACA, though, changed the status quo by mandating that Members are now eligible only for health plans created under the ACA or offered through an ACA health insurance exchange:

> Notwithstanding any other provision of law, after the effective date of this subchapter, the only health plans that the Federal Government may make available to Members of Congress and congressional staff with respect to their service as a Member of Congress or congressional staff shall be health plans that are—
>
> (I)    created under this Act (or an amendment made by this Act); or

(II)   offered through an Exchange estab-
lished under this Act (or an amendment
made by this Act).

42 U.S.C. § 18032(d)(3)(D)(i). The statute defines "Member of Congress" as "any member of the House of Representatives or the Senate" and defines "congressional staff" as "all full-time and part-time employees employed by the official office of a Member of Congress, whether in Washington, DC or outside of Washington, DC." § 18032(d)(3)(D)(ii). According to the plaintiffs, this provision "was passed so that Members of Congress and their staffs would be subject to the ACA in the same way as Members' constituents" and to preclude Members from receiving government contributions. Congress took this action, they say, "to address criticisms that it was reserving special 'Cadillac' benefits for itself or was unwilling to live with the health insurance it was mandating on the rest of the Nation."

OPM was charged with the task of implementing this statutory provision. It conducted notice-and-comment rule-making and issued a final rule, 78 Fed. Reg. 60653-01 (the "OPM Rule" or "Rule") on October 2, 2013. The Rule adopts the statutory definitions of "Member of Congress" and "congressional staff." 5 C.F.R. § 890.101. The implementing regulation states:

The following employees are not eligible to purchase a health benefit plan for which OPM contracts or which OPM approves under this paragraph … but may purchase health benefit plans, as defined in 5 U.S.C. 8901(6), that are offered by an appropriate SHOP as determined

> by the Director [of OPM], pursuant to [42 U.S.C. § 18032(d)(3)(D)]:
>
> (i)   A Member of Congress.
>
> (ii)  A congressional staff member, if the individual is determined by the employing office of the Member of Congress to meet the definition of congressional staff member in § 890.101 as of January 1, 2014, or in any subsequent calendar year.

5 C.F.R. § 890.102(c)(9). A congressional staff member that is not "determined to meet the definition of congressional staff member" remains eligible for FEHBP benefits. A "SHOP" is a Small Business Health Options Program; the Director determined the "appropriate SHOP" for Members to be the DC Health Link Small Business Market ("DC SHOP"), which is an exchange created by the ACA. The ACA limits participation in SHOPs to businesses with up to 100 employees. 42 U.S.C. § 18024(b)(2). The plaintiffs argue that this limitation would seem to make Members' employer—either "Congress" or "the federal government," according to the plaintiffs—ineligible for a SHOP exchange. However, the Centers for Medicare and Medicaid Services—which is not a party to this suit—authored a memorandum clarifying that "offices of the Members of Congress, as qualified employers, are eligible to participate in a SHOP regardless of the size and offering requirements set forth in the definition of 'qualified employer' in the Exchange final rule." Memorandum from the Ctr. for Consumer Info. & Ins. Oversight, Ctrs. for Medicare & Medicaid Servs., Affordable Insurance Exchange Guidance (Sept. 30, 2013), *available at*

http://cms.gov/CCIIO/Resources/Fact-Sheets-and-
FAQs/Downloads/members-of-congress-faq-9-30-2013.pdf
(last visited Apr. 13, 2015, as were all websites in this opin-
ion). OPM further determined that the government would
continue to provide pre-tax health insurance contributions
for Members who purchase certain plans from the DC SHOP,
and that those contributions would be calculated in the same
manner as for plans provided through the FEHBP. 5 C.F.R
§ 890.501(h).

Plaintiffs filed suit against OPM in the Eastern District of
Wisconsin, seeking a declaration that the OPM Rule is un-
lawful and void under the Administrative Procedure Act, 5
U.S.C. §§ 701–06. First, they argue that OPM lacks statutory
authority to grant pre-tax employer contributions to plans
offered through ACA exchanges. According to the plaintiffs,
the FEHBA only gives OPM authority to make contributions
for plans offered through the FEHBP; this authority, they ar-
gue, does not extend to the plans available to Members. Sec-
ond, they argue that the Rule violates the ACA because it al-
lows Members' employer—which the plaintiffs claim does
not qualify as a small employer—to participate in a SHOP
exchange. Third, and finally, the plaintiffs argue that the
regulation violates their "statutory and constitutional enti-
tlement to equal treatment" with Senator Johnson's constitu-
ents who purchase insurance on individual ACA exchanges.

In response to the plaintiffs' complaint, OPM filed a mo-
tion to dismiss, arguing that the district court lacked subject
matter jurisdiction because the plaintiffs do not have stand-
ing to bring this suit. The district court granted the motion to
dismiss. Given that the plaintiffs' suit alleges that the OPM
Rule allows them to receive more *favorable* treatment than

they believe they are entitled to—specifically, a pre-tax healthcare contribution from the government and insurance purchased from a SHOP exchange—the district court reasoned that they "receive, at worst, a *benefit*" from the regulation. Therefore, the court concluded, the plaintiffs suffered no injury that was traceable to the challenged regulation and do not have standing. Plaintiffs now appeal the district court's dismissal on standing grounds.

## II. Discussion

The jurisdiction of federal courts is limited to "Cases" and "Controversies," U.S. Const. art. III, § 2, and no "Case" or "Controversy" exists if the plaintiff lacks standing to challenge the defendant's alleged misconduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must show that he has suffered (or is imminently threatened with) (1) a concrete and particularized "injury in fact" (2) that is fairly traceable to the challenged action of the defendant, and that is (3) likely to be redressed by a favorable judicial decision. *Id*. at 560–61.

The injury suffered by the plaintiff "must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotation marks omitted). Neither psychological harm "produced by observation of conduct with which one disagrees" nor offense at the behavior of government and a desire to have public officials comply with one's view of the law constitutes a cognizable injury. *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982); *see also Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011). Furthermore, the plaintiff's injury must be sustained "as a consequence of" the challenged

conduct. *Valley Forge*, 454 U.S. at 485; *see also Lyons*, 461 U.S. at 102 (noting that, in order to have standing, a plaintiff's injury must be sustained "as the result of the challenged … conduct"). The plaintiff bears the burden of establishing the required elements of standing. *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 690 (7th Cir. 2014). We review a district court's decision on standing de novo. *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 739 (7th Cir. 2009).

The plaintiffs argue that they have suffered three independent injuries that are traceable to the challenged OPM Rule. First, they argue that the Rule imposes an administrative burden on Senator Johnson and his staff, forcing them to determine which staff members are "congressional staff" within the meaning of the Rule and the ACA on a yearly basis. Second, the plaintiffs argue that the Rule deprives them of their statutory and constitutional right to equal treatment with Senator Johnson's constituents. Third, Senator Johnson argues that the Rule causes him "reputational and electoral injury" because it requires him to participate in conduct which he believes to be illegal and gives him "special treatment" which is unavailable to his constituents. We will examine each of those alleged injuries in turn.

### a.  Administrative burden

According to the plaintiffs, the OPM Rule places an administrative burden on Senator Johnson and his staff because it requires them to determine which of Senator Johnson's staff are "congressional staff." The government, in contrast, contends that the Rule does not create any burden for the plaintiffs because it does not require them to actually *do* anything. We need not resolve this debate, however, because, even if the Rule does place an administrative burden

on plaintiffs, that does not give them standing to challenge the aspects of the Rule that they allege are illegal, which are unrelated to the imposition of an administrative burden.

"[A] plaintiff must demonstrate standing for each claim he seeks to press." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). This means that, for each claim of wrongdoing alleged, a plaintiff must demonstrate, in addition to redressability, that he has suffered (or is imminently threatened with) an injury that is traceable to the wrongdoing alleged in *that* particular claim.

The fact that a plaintiff has suffered an injury that is traceable to one kind of conduct does not grant that plaintiff standing to challenge other, even related, conduct; "standing is not dispensed in gross." *Id*. For example, in *Davis v. FEC*, the Supreme Court stated that the mere fact that the plaintiff had established standing to challenge a disclosure requirement imposed by one statutory provision—§ 319(b) of the Bipartisan Campaign Reform Act of 2002 ("BCRA")—did not necessarily mean that he had standing to attack a neighboring provision—§ 319(a), an "asymmetrical contribution limit." *Id* at 733–34. Rather, the Court required the plaintiff in *Davis* to separately show injury, traceability, and redressability with regard to § 319(a). Though the *Davis* plaintiff was able to demonstrate standing for that claim, *id*. at 735, the plaintiff in *Lewis v. Casey*, 518 U.S. 343 (1996), was not so successful. There, the Court held that a plaintiff had standing to challenge a state's failure to provide special services that the plaintiff, in light of his illiteracy, required to ensure his right of access to the courts. *Id*. at 358. That injury, however, did not give him standing to challenge other alleged administra-

tive deficiencies that deprived other people—such as non-English speakers—of their right of access to the courts, as those deficiencies had not personally injured the plaintiff: "the right to complain of *one* administrative deficiency [does not] automatically confer[] the right to complain of *all* administrative deficiencies." *Id.* at 358 & n.6; *see also Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."); *Mueller v. Raemisch*, 740 F.3d 1128, 1132–33 (7th Cir. 2014) (holding that the plaintiffs had standing to challenge certain aspects of Wisconsin's sex-offender registration scheme but lacked standing to challenge the scheme's prohibition against a Wisconsin sex offender's changing his name "because, while opposing it, neither [plaintiff] expresses any intention of changing his name").

Applying that rule to this case, the plaintiffs' alleged administrative burden cannot support their standing to challenge aspects of the OPM Rule that are entirely unrelated to that burden. Their asserted injury is not traceable to (i.e., "the result of," *Lyons*, 461 U.S. at 102, or "a consequence of," *Valley Forge*, 454 U.S. at 485) the conduct that they challenge—namely, the availability of tax-free government contributions, Congress's eligibility for a SHOP exchange, and an equal protection violation. Put differently, plaintiffs' administrative injury would continue to exist even if the Rule were cured of all of its alleged infirmities.

The plaintiffs contends that this claim-by-claim approach is inapplicable here because they have only one claim—that the OPM Rule is unlawful—and because their administrative

injury is caused by the "conduct" that they challenge—the enactment of the Rule. That argument paints with too broad a brush. The plaintiffs do not object to the enactment of the Rule itself, for example by claiming that its enactment was procedurally deficient. Rather, they claim that specific aspects of the Rule, none of which are related to their administrative burden, are substantively unlawful. The relevant "conduct" that they challenge, therefore, is not the enactment of the Rule, but rather OPM's allowance of federal healthcare contributions, its declaration that members of Congress and their staffs are eligible for SHOP plans, and its alleged violation of their equal protection rights. Similarly, the conduct challenged by the plaintiff in *Davis* was not the enactment of the BCRA, but rather the inclusion of specific aspects of that Act that actually caused him injury. The Supreme Court, though, required that the plaintiff demonstrate an injury stemming from each challenged aspect of the Act; demonstrating an injury caused by one aspect of a legislative action was not sufficient to give him standing to challenge other aspects of that action.

The plaintiffs attempt to differentiate *Davis* by pointing to the fact that, in that case, the challenged aspects of the BCRA were separated into two distinct subsections of the statute. Only because of this separation, they argue, did the Supreme Court require the plaintiff to separately demonstrate standing for the different aspects of the Act that he challenged. Here, in contrast, there is only one OPM Rule, which the plaintiffs contend is not similarly divisible. Because their injury derives from that indivisible Rule, they argue, they have standing to challenge the Rule as a whole. Furthermore, plaintiffs argue, the remedy that they seek—

invalidation of the Rule—would eliminate their administrative burden injury.

We find this argument unconvincing. First the OPM Rule *is* divisible. It substantively amends six separate regulations, and many of those amendments are broken into subsections, just like the BCRA. Importantly, the plaintiffs' alleged administrative burden is caused by amendments to a different regulation (5 CFR § 890.102) than the amended regulation that allows government contributions to Members' health plans (5 CFR § 890.501). We do not see why an injury caused by amendments to one regulation should permit the plaintiffs to challenge amendments to a separate regulation, just because the amendments were made simultaneously.

Second, an official body's choice of how to organize a statute or set of regulations is irrelevant to the standing inquiry. Nothing in *Davis* suggests that the Court's standing analysis would have been any different had the BCRA's disclosure provision and asymmetrical campaign contribution limit been found in the same statutory subsection. The reason for this is straightforward: in order to demonstrate standing, a plaintiff's injury must match the legal problem he alleges. A plaintiff cannot attack a perceived problem that does not cause him injury, regardless of its organizational relationship to other provisions (illegal or not) that do cause him injury.

Finally, the fact that the plaintiffs have requested a remedy—vacatur of the OPM Rule as a whole—that would coincidentally eliminate their alleged injury likewise does not impact our standing analysis. Although vacatur is the presumptive remedy for a violation of the Administrative Procedure Act, courts have discretion to craft other remedies.

*See, e.g., Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005); *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002). In other words, were the plaintiffs to prevail on the merits of their case, the district court could impose a remedy that, while alleviating the substantive legal concerns they identify, would not cure their administrative injury; for example, partial vacatur is sometimes an appropriate remedy. *See Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79 (D.D.C. 2010) (ordering partial vacatur of an agency's arbitrary and capricious permit). Furthermore, even if vacatur of the entire Rule were the only possible remedy in this case, the fact that this remedy would by coincidence redress plaintiffs' alleged injury would not provide them with standing to challenge aspects of that Rule that have not caused them injury.

### b. Equal protection

The plaintiffs next assert an injury based on "being denied the equal treatment guaranteed by the ACA and the Constitution." According to the plaintiffs, § 18032(d)(3)(D) of the ACA was enacted to ensure that members of Congress and their staffs would be "in the same boat" as the "millions of Americans [forced] to purchase insurance on the newly created exchanges." This argument fails for several reasons.

First, the plaintiffs cannot assert an injury based on the violation of a *statutory* right to equal treatment because they have no such right. "The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. … Essentially, the standing question in such cases is whether the … statutory provision on which the claim rests properly can be under-

stood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citations and internal quotation marks omitted).

To discern whether a statute creates legal rights, we must determine "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). "Generally, we consider three factors to determine if a statute creates an enforceable right: (1) whether Congress intended the provision to benefit the plaintiff, as evidenced by rights-creating language; (2) whether the right is not so vague and amorphous that its enforcement would strain judicial competence; and (3) whether the statute unambiguously imposes a binding obligation on the [government], such that the provision is couched in mandatory, rather than precatory, terms." *Bontrager v. Ind. Family & Soc. Serv. Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (citation and internal quotation marks omitted).

The plaintiffs argue that § 18032(d)(3)(D) creates a right for them to be given equal treatment with Senator Johnson's constituents. In their view, the OPM rule violates that right because it treats them differently than those constituents. But nothing on the face of § 18032(d)(3)(D) states or implies that Members have a right to equal treatment with their constituents. The plaintiffs contend that the purpose underlying the passage of that provision—to ensure that Members "would be subject to the ACA in the same way as Members' constituents who would be most directly affected by the ACA"— indicates that Congress intended to give Members a right of equal treatment with those constituents. We disagree. First, rather than containing "rights-creating" language, § 18032(d)(3)(D) acts to limit the choices available to Mem-

bers. This suggests that, by passing the section, Congress sought to constrain the rights of its Members, not to expand them. Second, plaintiffs' proposed right is "vague and amorphous." Their briefs do not make clear which groups are to be treated equally or what "equal treatment" would even mean in this context.[1] If even these plaintiffs cannot describe

---

[1] In their complaint, plaintiffs alleged that "the OPM Rule violates the Equal Protection Clause of the United States Constitution in that it treats Members of Congress and their staffs differently than other similarly-situated employees who obtain insurance coverage pursuant to the terms of the ACA. No other employees of large employers are able to purchase insurance through small business exchanges with tax free subsidies from employers." There, they seem to be comparing Members to a specific subset of constituents: employees of large private employers. The plaintiffs did not mention a statutory right to equal protection in their complaint.

On appeal, however, plaintiffs seem to have changed their position. At times they suggest that they have a right to equal treatment with Senator Johnson's "constituents," a much larger comparator group than they suggested in their complaint. Elsewhere in their briefs, however, plaintiffs suggest that the comparator group is those constituents who purchase insurance off of individual ACA exchanges. This second alternative makes more sense in light of plaintiffs' argument that *they* should be offered only plans from those exchanges. After all, their eligibility for employer contributions puts them on equal footing with many of Senator Johnson's constituents, who similarly receive employer contributions; we do not see how they could claim unequal treatment with *those* constituents. Focusing on "constituents who purchase insurance off of ACA individual exchanges" is also problematic. Anyone can choose whether or not to purchase their insurance that way, so plaintiffs' theory compares their treatment not to the treatment of a fixed group of individuals, but rather to the treatment of a group who choose to be treated in a certain way. It is not the government who treats that group in that way; rather, they do so by choice. Even without these problems and inconsistencies, however, the plaintiffs would still not have a cognizable equal protection claim for the reasons we give in the main text.

the nature of the proposed right, what is a judge tasked with enforcing that right to do? Third, the statutory context of the section does not in fact suggest that it was passed to ensure equal treatment. Contrary to plaintiffs' suggestions, § 18032(d)(3)(D) was not necessary to ensure that Members would be "subject to" the ACA to the same extent as their constituents. The ACA is a law of general applicability; even without that section, it would have applied to all Americans, whether or not they are in Congress. What the section *did* accomplish, however, was to place an additional constraint on the healthcare options available to Members; the ACA does not place that constraint on any other classes of individuals. This is not a requirement of equal treatment; rather, it is a mandate that Members be placed in a *worse* position than anyone else. Consequently, we find that § 18032(d)(3)(D) does not create a private right of equal treatment. The plaintiffs therefore cannot base his standing on the violation of that purported right.

The plaintiffs are left, therefore, with a claim that their constitutional right to equal protection has been violated. In rejecting plaintiffs' equal protection theory of injury, the district court reasoned that, apart from any hypothetical electoral/reputational injury (which we will examine next), the aspects of the OPM Rule that plaintiffs claim are illegal—the availability of tax-free health care contributions and access to a SHOP exchange—cause them to "receive, at worst, a *benefit*," which cannot be considered an equal protection injury-in-fact. On appeal, plaintiffs argue that what looks to some like a benefit (such as a healthcare contribution) can, to a plaintiff, also act as an injury. We agree with the plaintiffs on this point—standing does not rest on a court's belief as to whether unequal treatment, as a whole, benefits or harms a

plaintiff. Rather, it rests on whether the plaintiff has suffered an injury, whether or not that injury is arguably offset by some monetary gain.

The only type of harm that the plaintiffs identify as *stemming* from their unequal treatment is an injury to Senator Johnson's reputation and electoral prospects, which we consider below. The plaintiffs, however, argue that, even if the OPM Rule has not caused them (or imminently threatened them with) reputational and electoral harm, they would still have a judicially cognizable injury merely because the Rule, in the abstract, treats them unequally. We disagree. The mere allegation of unequal treatment, absent some kind of actual injury, is insufficient to create standing. *See Youth Alive v. Hauppauge Sch. Dist.*, No. 08-1068, 2012 WL 4891561, at *3 (E.D.N.Y. Oct. 15, 2012) ("Although the injury-in-fact requirement is not as stringent in Equal Protection cases, a plaintiff must still establish that she suffered *some* sort of identifiable harm. … Whether it's a barrier or an unequal playing field that affects a plaintiff's pursuit, she must identify some disadvantage to meet the constitutional requirement for standing."). We have been unable to find any case in which a plaintiff was deemed to have standing based solely on being treated differently. At the very least, plaintiffs have had to show that the challenged classification creates a "barrier that makes it more difficult for members of one group to obtain a benefit," *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993), or causes "non-economic injuries" such as "stigmatizing members of the disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739 (1984).

Even more problematic for plaintiffs' theory is that they claim to be treated too favorably. We fail to see how, in the absence of some other sort of injury, being treated unequally well can constitute the sort of "injury" that Article III requires in order to ensure that the plaintiff has "such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth*, 422 U.S. at 498–99 (internal quotation marks omitted); *see also Youth Alive*, 2012 WL 4891561, at *3 ("[I]f Plaintiffs were correct that they could establish standing based merely on differential treatment, a party that *benefited* from a classification would, in theory, be able to challenge its validity. Such a result would fundamentally contradict the principle of standing."); *Janes v. Triborough Bridge & Tunnel Auth.*, 889 F. Supp. 2d 462, 466 (S.D.N.Y. 2012).

### c.   Reputational and electoral harm

The plaintiffs, therefore, cannot rely on the theory that they have been injured by being treated unequally favorably in the abstract. They have, however, also alleged an injury that they say derives from their unequal treatment: the "reputational and electoral harms that the Rule imposes on Members and their staffs by virtue of giving them special treatment unavailable to their constituents and making them complicit in the violation of a congressionally enacted statute." They also allege that those asserted harms give them standing independent of any equal protection theory. We disagree with both of these arguments.

Plaintiffs do not explain how their reputational and electoral theory of injury could apply to Ericson, a non-elected staff member, so we focus our analysis of this issue on Sena-

tor Johnson. We have repeatedly held that public officials forced to take what they believe to be illegal actions cannot premise standing on the assertion that they do not want to be complicit in unlawful behavior. *See Cronson v. Clark*, 810 F.2d 662, 664 (7th Cir. 1987) (holding that the Illinois Auditor General did not have standing where he argued that he was being unlawfully precluded from conducting a full audit of the state supreme court); *D'Amico v. Schweiker*, 698 F.2d 903, 906 (7th Cir. 1983) (holding that administrative judges from the Social Security Administration lacked standing to complain that a directive by their superiors required them to decide Social Security cases in a manner contrary to law because it required them to do *less* than they thought was legally required).[2]

Senator Johnson tries to distinguish *Cronson* and *D'Amico* by arguing that the plaintiffs in those cases did not have to worry about being reelected; politicians, on the other hand, can suffer greatly by being perceived to be taking part in illegal action. To support this position, Senator Johnson relies

[2] Senator Johnson contends that these decisions are contrary to the Supreme Court's holding in *Craig v. Boren*, 429 U.S. 190 (1976), which he argues stands for the proposition that individuals have standing to challenge government compulsion to participate in law-breaking. This is an inaccurate characterization of *Craig*. The Court in that case found that the plaintiff had standing because the statutory sections she challenged obliged her to either "heed the statutory discrimination, *thereby incurring a direct economic injury through the constriction of her buyers' market*, or to disobey the statutory command and suffer … 'sanctions and perhaps loss of license.'" *Id*. at 194 (emphasis added). The portion of that statement that we have italicized—which plaintiffs omit from their quotation of that sentence—makes clear that the *Craig* plaintiff had standing not because she was compelled to participate in law-breaking, but because she faced economic injury regardless of which option she chose.

on the D.C. Circuit's decision in *Boehner v. Anderson*, 30 F.3d 156 (D.C. Cir. 1994). In that case, Representative John Boehner of Ohio challenged a cost of living adjustment that increased his compensation, arguing that the adjustment violated the Twenty-Seventh Amendment. The defendants argued that his receipt of additional money could not be an "injury," but Representative Boehner argued that receiving an unconstitutional salary increase would harm him. The D.C. Circuit agreed with Representative Boehner, finding that he had standing:

> The [defendant] argues further that an increase in pay is not an injury. Mr. Boehner, however, says that in the context of his constituency it is. We do not think it the office of a court to insist that getting additional monetary compensation is a good when the recipient, a congressman, says that in his political position it is a bad.

*Id*. at 160. Senator Johnson argues that, just like Representative Boehner, he has standing despite the fact that the conduct he challenges provides him with a monetary benefit, because that conduct forces him to engage in illegal behavior, which he alleges will cause him reputational and electoral harm. [3]

---

[3] Senator Johnson also points to a Supreme Court case, *Meese v. Keene*, 481 U.S. 465 (1987), which he says supports this argument. The plaintiff in that case was a politician who desired to exhibit certain films which, under the Foreign Agents Registration Act of 1938, were designated as "political propaganda." *Id*. at 467–68. The Court held that the plaintiff had standing to seek an injunction against the application of the Act to these three films. His injury, according to the Court, was that "if he were to exhibit the films while they bore such characterization, his personal,

OPM attempts to distinguish *Boehner* by arguing that, in that case, the allegedly illegal pay raise occurred automatically; here, in contrast, Senator Johnson will receive the purportedly illegal benefits only if he asks for them. Senator Johnson is free to forego the allegedly illegal benefits that he believes constitute unequal treatment. He could attain precisely what he wants—an unsubsidized health plan purchased through an individual ACA exchange—by opting out of the insurance offered to him through OPM and instead purchasing insurance himself from an individual exchange. We have previously held that plaintiffs "cannot allege an injury from one of [multiple] options where they can choose another which causes them no injury." *Fire Equip. Mfrs. Ass'n, Inc. v. Marshall*, 679 F.2d 679, 682 n.5 (7th Cir. 1982). Here, Senator Johnson can avoid his asserted injury by refus-

political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired." *Id*. at 473. For multiple reasons, this case does not support Senator Johnsons' position here. First, the *Meese* Court stressed that the plaintiff had standing because his First Amendment right to exhibit the films was chilled, as doing so while they were designated as propaganda would hurt his reputation and electoral chances. Here, in contrast, Senator Johnson has no constitutional right to the benefits at issue—he does not even want them; unlike the plaintiff in *Meese*, he is not faced with the choice between exercising a fundamental right and facing the wrath of his constituents. Second, the plaintiff in *Meese* "submitted detailed [and uncontradicted] affidavits, including one describing the results of an opinion poll and another containing the views of an experienced political analyst, supporting the conclusion that his exhibition of [films labeled as 'political propaganda'] would substantially harm his chances for reelection and would adversely affect his reputation in the community." *Id*. at 473–74. Senator Johnson presents no similar evidence suggesting that his political standing will be diminished by his accepting (or simply being offered) the benefits he claims are illegal.

ing the benefits that he alleges to be illegal. Such an avoidable injury cannot support standing.

Senator Johnson offers two arguments in response. First, he contends that *Boehner* is indistinguishable because OPM is mistaken as a matter of fact—just as Senator Johnson can decline federal healthcare benefits, so too could Representative Boehner have either declined to accept his illegal pay increase or else returned the extra money to the Treasury. The pay increase in *Boehner*, however, was "automatic," *Boehner*, 30 F.3d at 159, and members of Congress are prohibited by law from refusing to accept their salary. *See* Ida A. Brudnick, Cong. Research Serv., *Salaries of Members of Congress: Congressional Votes, 1990–2014*, at 3 n.10 (2014), *available at* http://fas.org/sgp/crs/misc/97-615.pdf. It is true that Representative Boehner could have donated his increased salary back to the Treasury (or to a charity), *id*., but that is beside the point—although Representative Boehner could decide what to do upon receipt of his allegedly illegal benefit, he could not refuse the benefit itself. So, the fact that Senator Johnson can decline the benefits that allegedly cause him electoral injury distinguishes this case from *Boehner*.

Next, Senator Johnson argues that the mere fact that illegal healthcare benefits are made *available* to him causes him electoral and reputational injury, even if he refuses these benefits. First of all, we do not see how the mere availability of these benefits could cause him injury in a future Senate reelection campaign because each of his opponents, if elected, would be offered the same benefits. The availability of these benefits is an unavoidable perquisite of the office; as

such, it cannot be used to distinguish between those running for that office.[4]

The D.C. Circuit's analysis in *Boehner* suggests that we cannot second-guess an office holder's assertion that the receipt of certain benefits will cause him or her political harm; it held that "it [is not] the office of a court to insist that getting additional monetary compensation is a good when the recipient, a congressman, says that in his political position it is a bad." 30 F.3d at 160. However, federal courts have a duty to ensure that they possess subject-matter jurisdiction; they should not merely rely on the parties' assurances. *McCready v. White*, 417 F.3d 700, 702 (7th Cir. 2005).

The Tenth Circuit has rejected the reasoning of *Boehner*, holding in *Schaffer v. Clinton* that a representative did not have standing to challenge an allegedly unconstitutional pay raise. 240 F.3d 878, 885 (10th Cir. 2001). That court dismissed the plaintiff's theory that the pay raise was damaging to his political position and credibility among his constituency because he had pointed "to no concrete evidence of a loss of credibility or other reputational injury as a result of" the raise. *Id*.

---

[4] This also distinguishes our case from *Boehner*. The Twenty-Seventh Amendment bars changes to a Senator's or Representative's compensation from taking effect until after the next congressional election. U.S. Const. amend. XXVII. Therefore, even if Representative Boehner was correct that his mid-term salary increase was unconstitutional as to him, it would not have been unconstitutional for one of his opponents, if elected, to receive that higher salary. Representative Boehner's receipt of an unconstitutional salary increase, then, would actually differentiate him from his opponents.

We join the Tenth Circuit in parting from the D.C. Circuit's analysis in *Boehner*, and conclude that a political figure's assertion, without more, that the receipt (or option of receiving) a benefit will hurt his or her reputation or electoral prospects is insufficient to establish standing. Respectfully, we do not see how Senator Johnson's reputation could be sullied or his electability diminished by being offered, against his will, a benefit that he then decided to refuse. He could not be accused of participating in an illegal scheme if he declined to participate. The possibility of electoral or reputational harm, therefore, is much too "conjectural or hypothetical" to constitute the type of concrete injury that is required to establish Article III standing. *Lyons*, 461 U.S. at 102.

## III. Conclusion

We AFFIRM the district court's dismissal of plaintiffs' complaint for lack of standing.